# First National Bank of Easton *versus* Wirebach's Executor.

1. In an action on a promissory note where the defence is the insanity of the maker, notes of the testimony of a medical expert, taken at a former trial of the same cause, are admissible.

   The opinion of an expert is of no value when the facts of which it is predicated are not established; but whether they are so established is a question for the consideration of the jury.

   Such notes of testimony are not rendered inadmissible from the fact, simply, that new and unexpected matters have been introduced at the second trial, upon which the expert was not cross-examined at the first trial.

2. One, not an expert, cannot be permitted to give an opinion as to another's mental soundness or unsoundness, until he has first testified to facts within his own knowledge tending to show that mental condition. Where the facts testified to are inconclusive in their nature and

of such neutral character as to be consistent either with soundness or unsoundness of mind, they cannot be made the basis of an opinion as to either. Facts testified to by certain witnesses in this case *held* not to be such as could be made the basis of an opinion as to the defendant's insanity.

3. Although facts, testified to by certain witnesses taken separately, may not prove or tend to prove a person's sanity or insanity, so as to qualify such witnesses to express their individual opinions on the question of sanity, yet it does not follow that these facts when taken together and in connection with other evidence are wholly irrelevant and immaterial to the issue,—and the testimony of such witnesses will not be stricken out.

4. Where there is any evidence which alone would justify an inference of the disputed fact, it must go to the jury; no matter how strong or persuasive the countervailing proof. Under this rule—*held* in this case, that the evidence of the defendant's insanity was sufficient to warrant the submission of the case to the jury.

March 14, 1884. Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STERRETT, GREEN and CLARK, JJ.

ERROR to the Court of Common Pleas of *Northampton county:* Of January Term, 1883, No. 238.

Assumpsit, by the First National Bank of Easton, Pa., against Uranus Wirebach, executor of Jacob C. Wirebach, deceased, upon a promissory note indorsed by the decedent. Plea, non-assumpsit.

Upon the trial, before MEYERS, P. J., the following facts appeared: The note in suit, which was for $10,075.92, and dated December 7, 1876, was drawn by Richards & Christman to the order of J. C. Wirebach, and by him endorsed. It was given to take up ten other notes aggregating the same amount, of which W. U. Stocker & Co. were makers and Richards & Christman endorsers; Wirebach being also an endorser upon about $4,000 worth of them.

One of these notes was protested in December, 1876, and it was arranged between Christman and McEvers Forman—president of the First National Bank of Easton, which had discounted them—that they should be replaced by one note, drawn by Richards & Christman, and that the latter should procure J. C. Wirebach as endorser thereon. W. U. Stucker & Co. were not parties to the new note.

In pursuance of this arrangement Christman, on December 7, 1876, met Wirebach by appointment and went with him to the bank, where, in the presence of Forman, and by his assistance, the note in suit was duly executed by Richards & Christman and endorsed by J. C. Wirebach.

Wirebach died in May, 1877, and upon the non-payment of the note at maturity suit was brought by the bank against his executor. The defendant set up that both before and at

the time of the execution of the note Wirebach was of unsound mind, the result of several strokes of paralysis, and was incapable of contracting.

To sustain this defence the defendant offered the notes of testimony of Dr. E. C. Mann, a medical expert examined at a former trial of the cause. This was objected to by the plaintiff, on the grounds: that the testimony was based on "a hypothetical state of facts different from that now proved;" that "the hypothetical question contained statements of matters upon which no testimony whatever has been offered by the defendant at this trial;" "that the plaintiff has the right to cross-examine a witness upon a question based upon the facts testified to in this trial." Objections overruled and testimony admitted. Exception. (First assignment of error.)

The defendant called one Daniel Lauerbach to prove facts and circumstances showing the insanity of Wirebach. The witness testified as follows: "I live in South Easton, and have lived there since May, 1834; I knew Mr. Wirebach from 1835 or 1836: a year or two after I came to the place: I was acquainted with him up to the time of his death: he was a man of very good health, according to my judgment: I never knew him to be sick: he was a man of active habits and a man of intelligence: he was taking small contracts: had a contract on the Lehigh Valley R. R., I think: he filled the office of chief burgess at one time, and was a member of town councils and a justice of the peace: I can't tell at what date or what year it was that he was first attacked with paralysis: I saw a change, his gait was altered: his looks, and his gait, and his conversation. I don't think he walked lame, or anything like limping, but he had to be careful in his gait, so that if he wanted to turn he came to a halt: his limbs were affected, benumbed like: I called on him: he was confined to his house and to his bed, and I went in the sitting-room, and he was lying on a lounge and his wife and daughter were in the room, and I spoke to him as I passed the lounge and he did not seem to take notice of me, or of what I said, and finally he turned up, and I said: ' Wirebach, how do you feel,' and his wife told me that—. Yes sir, right in his presence, and I made out that he felt bad; or a kind of unintelligent answer, but I made out it was that: that is all the conversation I had with him; his speech was a kind of broken manner: he had to make an effort: I couldn't make out an intelligent answer: I had difficulty in understanding him, and his wife then made an apology: said as much as he was unconscious and did not know: that his mind was affected, that he couldn't talk, nor he couldn't give an intelligent answer; and me and the daughter had our conversation together, and I

then left: I called on him in a week or ten days afterwards, and I had no conversations whatever with him, what I had I had with the family: his limbs were paralyzed; I could not say both legs, but his general gait was like a person who has got what we call paralysis: before this there was no difficulty in understanding him: I don't know that I can explain the appearance of his face after the paralysis, but it had a strange appearance, his eyes or his face distorted like; his eyes would enlarge or stare: I have stated before that I had very little conversation with him; no more than we would meet along the street, and I took notice that his conversation was not like before; we would meet before, and he would speak frequently on any subject, and ready, and after he was affected thus, there was very little conversation between us; perhaps he would say 'good morning,' or pass some little remarks about the weather, and that was about all; in fact, I saw it was difficult to hold a conversation with him; I do not recollect any special conversation; what I say is we could not hold a conversation as we did before; but as I said before, his mind was affected; his speech was affected so that it seemed to be an annoyance to have a conversation with him at all; at the time when I called to see him his countenance was, in my opinion, intelligent in appearance."

*Cross examined.*—"I first went to see Wirebach in March 1876. I can't give the exact date: I spoke to him when I went in and asked him how he felt and made out that he said as much that he felt badly: I can't tell how sick he was, but he looked as though he was badly affected, his mind and his body that is about all. I have been examined more than three times here as a witness before this. In my testimony upon previous trials, I did say that Mrs. Wirebach said to me in the presence of her husband, that her husband's mind was affected: In my judgment, as I said before, his body was affected and his speech and gait, but I wouldn't say that he was of unsound mind at the time."

Thirteen other witnesses called by the defendant gave similar testimony, and the plaintiff asked to have all of said testimony stricken out "for the reason that it does not prove or tend to prove insanity on the part of J. C. Wirebach or unsoundness of mind." Application refused and testimony admitted. Exception—(Second assignment of error).

Joseph Richards called by the plaintiff in rebuttal, testified: "I was a member of the firm of Christman & Richards, I went to Mr. Wirebach's house in company with Mr. Christman: I think it was in the beginning of January 1877: I went there to get a note signed to the Phillipsburg Bank: Nobody was in the house: It was in the kitchen and there was nobody there

but his wife and himself: He was lying on the lounge when we came there and then he got up and Christman asked him about the note and he said he would sign it for us, but most of the conversation was between Christman and the wife. . . . . . He took the note and got a pen and ink and then went round to the other corner and signed it and then gave it to Christman; Mrs. Wirebach was present when he did this and saw what he was doing. . . . . . Christman and his wife got to talking about their youthful days and he was listening; he used to laugh once in a while and put in a word, and they talked also about when they first bought that property. He talked very little except about the note. . . . . . I have known Mr. Wirebach by sight about twenty-five or thirty years, but only about eight years personally; I conversed with him only two or three times during the last year of his life; I don't recollect whether he was lame, he did not walk much, he appeared to be very feeble and there was a difficulty in his speech: there was a hoarseness and difficulty in articulating."

Plaintiff then proposed to ask witness; "State whether in your opinion, at that time from what you saw and heard of him, that Jacob C. Wirebach was a man of sound or unsound mind?" Objected to on the ground that the witness had not testified to sufficient facts upon which to base an opinion as to sanity or insanity. Plaintiff called five other witnesses, who gave similar testimony and he offered to ask each of them the same question, to which objection was made by the defendant on the same ground and the questions excluded by the court.—Exceptions—(Third assignment of error).

Other witnesses called by the plaintiff testified in rebuttal that from 1874 to 1875 Wirebach was a director, president and superintendent of the Easton and South Easton Passenger Railway Company; that in 1875 or 1876, or both, he made contracts for the sale of real estate, signed and acknowledged deeds for the conveyance of the same, satisfied a mortgage, collected rents and interest, and bought and sold stock; that he gave testimony as a witness in open court; and also before an auditor on the evening before the day when he indorsed the note in suit.

This auditor, F. H. Lehr, Esq., testified that he took down all the testimony given on that occasion pretty much as it was delivered; that he saw Wirebach while he was being examined; that he did not see anything to indicate that he was of unsound mind, and that there was nothing in his appearance or in what he said or did that excited in his mind the least suspicion that Wirebach was not a man of sound mind. Lehr's testimony was substantially corroborated by

George W. Stout and B. F. Fackenthall, attorneys present at the said examination before the auditor.

The plaintiff submitted, inter alia, the following points:

8. " The testimony of the defence relates to isolated conditions of mind during 1875 and part of 1876, and even if. believed by the jury, is too weak and inconclusive to establish habitual unsoundness of mind during these years." Affirmed.

10. " The defence having failed to prove habitual unsoundness of mind in Mr. Wirebach, and having failed also to prove any mental incapacity on December 7, 1876, the day the note in suit was indorsed by him, the presumption is that he was sane on that day, and the verdict of the jury must be for. the plaintiff." Refused. (Seventh assignment of error.)

11. " Under the law and the evidence of this case the verdict of this jury must be for the plaintiff." Refused. (Eighth assignment of error.)

In the general charge the court instructed the jury, inter alia, as follows: " You will bear in mind that the note in suit was signed and indorsed on the 7th of December, 1876, and . the question offered for your determination is not whether Wirebach was of sound or unsound mind a year or so before · that date, except so far as it may indirectly have a bearing upon the real question in issue, but whether he was actually of sound or unsound mind on the 7th of December, 1876, the day the note was signed. This is the real question in the case. On the evening prior to December 7, 1876, according to the testimony of Mr. Fackenthall, Stout and Lehr, Wirebach was examined as a witness, testifying before Mr. Lehr as auditor, upon the question of the value of the services of. John Evans, an administrator in an estate. I only follow the rule laid down by the Supreme Court upon this question, and instruct you if you find (taking in consideration that there is no evidence in this case upon which to submit to you the question of the habitual unsoundness of mind of Wirebach prior to December 7, 1876) from the testimony of these three witnesses as well as the testimony of John Evans, who testifies to the same transaction, that Wirebach was of sound mind on the evening of the 6th of December, 1876, then it is your duty to render a verdict in favor of the plaintiffs for the amount of the note, together with interest from maturity, as there is no evidence that after that time, and before the execution of the· note, Wirebach was of unsound mind. . . . . . [Even though the witnesses and experts may have been mistaken as to the cause of his disease, it is nevertheless your duty to examine the testimony as to the appearance, language, conduct, conversation and want of memory of Wirebach, and, if they were so marked and distinct in their character, to determine from

them whether he was of unsound mind and incapable of making a binding contract on the 7th of December, 1876.] (Fourth assignment of error.) . . . . . [Where witnesses testified to the conversation of Wirebach, of course, if you had the language repeated to you word for word, you would be able to form a more intelligent judgment whether the conversation gave indications of insanity or not. Many of the witnesses could not repeat what Wirebach said, but that his conversation was not connected, that he rambled from one subject to another, repeated the same thing over again, thus indicating by his conversation, a loss of memory so perceptible that the witnesses formed the impression at the time that he was of unsound mind. If Wirebach attempted to do any business, such as the collection of rent, interest, or other transactions, and in which he showed such a lack of memory, that could only be attributed to some great mental disorder, of course, in such a case, such testimony is to be taken into consideration.] (Fifth assignment of error.) . . . . . [After you have examined all the testimony as to the mental condition of Wirebach prior to and after December 7, 1876, for, in the language of the Supreme Court, that testimony is to be used for the purpose of ascertaining what light it sheds upon the mental condition of Wirebach on the 7th of December, 1876, and before you can render a verdict in favor of the defendant you must be satisfied from all the testimony in the case given by the plaintiff's and defendants' witnesses, including the testimony of Charles Christman, who was in bank with Wirebach that day, the testimony of Pipher, who saw him on the day the note was signed, that Wirebach, when he was in the bank and signed his name to the note as indorser, was of unsound mind and did not know and understand the nature and character of his contract of indorsement.] " (Sixth assignment of error.)

Verdict for the defendant and judgment thereon; whereupon the plaintiff took this writ of error, assigning for error the admission and refusal of evidence as above noted; the answers to his points, and those parts of the general charge set out in brackets.

*Howard J. Reeder* and *William Mutchler*, for plaintiff in error.

*W. S. Kirkpatrick* and *E. J. Fox*, for defendant in error.

Mr. Justice CLARK delivered the opinion of the court, October 6, 1884.

At the trial of this cause, the testimony of Dr. E. C. Mann,

a medical expert examined at a former trial, on behalf of the defendants, was admitted ; the plaintiffs objected to the reading of the notes upon several grounds ;—that the testimony is based upon a hypothetical state of facts, different from that now proved ; that the hypothetical question, in answer to which the witness then testified, is based upon facts, of which no evidence whatever is now given, and, that the plaintiff has a right to cross-examine the witness, upon the basis of the testimony now adduced. We cannot say, from an examination of the testimony taken at the last trial, that the hypothesis assumed is not fairly consistent with the facts sought to be established, and alleged to be proved, by the defendants. The form of the interrogatory was such as disclosed clearly what specific facts were assumed, and upon which, the opinion of the expert was given ; that opinion, therefore, could have no weight with the jurors in their deliberations, unless they found the facts assumed in the hypothesis, to have been established by the proofs. Each side had the right to an opinion from the witness, upon any hypothesis reasonably consistent with the evidence ; and, whether the facts were fairly and fully stated in this instance, for the opinion of the witness, was a question for discussion to the jury. The opinion of an expert can be of no value, when the facts of which the opinion is predicated, are not established ; whether they are so established is for the subsequent consideration of the jury. The plaintiff was certainly entitled to the benefit of a proper cross-examination, of which, however, he availed himself at the time ; it cannot be pretended, that a deposition is rendered inadmissible, from the fact simply, that new and unexpected matters have been introduced at the trial, upon which no cross-examination was conducted ; this is the form and meaning of the objections made. The first specification of error is not sustained. It is certainly a well recognized rule of evidence, that a witness, who has not special knowledge and experience, cannot be permitted to testify to a mere matter of opinion. A person may acquire skill by general study and experience, in special departments of knowledge, such as will qualify him to give an opinion as an expert, in matters pertaining to that specialty—or, he may possess such special personal knowledge of the particular person or thing under consideration, as will qualify him, although not properly an expert, to express an opinion as to that particular object ; in either case, however, the qualification of the witness must first appear, in the former, by establishing his pretensions as an expert, in the latter, by showing the personal knowledge and particular facts, upon which the witness has been enabled to rest an opinion. The question of qualifica-

tion is, in both cases, one, in the first instance, for the court, resting largely in the exercise of a sound discretion; and it is for the jury to decide, whether any, and if any, how much weight should be given to his opinion.   Del. & Chesapeake Steam Tow-boat Co. v. Stairs, 19 P. F. S., 36; Minnequa Spg. Impt. Co. v. Coon, 10 W. N. C., 502.

We are satisfied that the discretion of the court was wisely exercised in this case, in not permitting Joseph Richards, and the other witnesses, named in the 3d assignment of error, to give an opinion as to Mr. Wirebach's sanity:   One, not having the pretensions of an expert, cannot be permitted to give an opinion as to another's mental soundness or unsoundness, until he has first testified to facts within his own knowledge, tending to show that mental condition:  Bank v. Wirebach, 12 W. N. C., 150; Dickinson v. Dickinson, 11 P. F. S., 401; Stokes v. Miller, 10 W. N. C., 241.  The particular facts, stated by each of these several witnesses, must be taken alone, as the basis of the proposed opinion of that witness; thus considered, they are found to be in themselves inconclusive in their nature, of such a neutral character as, in some instances, at least, to be consistent either with soundness or unsoundness of mind.  Such facts could not reasonably be assumed as the basis of an opinion, as to either.  We cannot without unduly extending this opinion, refer, in detail, to the facts testified, but a careful examination will show that the discretion of the court was well exercised.

Whilst the facts thus isolated, in themselves, may be inconclusive, and not such as to justify the expression of an opinion, by the witness stating them, it does not follow, that they are wholly immaterial and irrelevant to the question under consideration.   The opinion of an unskilled witness must be given from facts within personal knowledge, but the judgment of the jury is upon the whole testimony in the cause.  A fact altogether inconclusive in itself may form a link in a chain of circumstances, and become of the largest importance; it may be one of a number of facts, the force of which, taken together, cannot be broken.  Thus the mere fact of a patient's feeble health, or of his suffering from paralysis, taken alone or together, may indicate some degree of mental impairment, but they do not tend to prove want of mental capacity, that condition of mind which incapacitates the patient from the performance of ordinary business affairs; considered, however, in connection with his acts and declaration, they may become an important factor in the judgment of the jury. We are of opinion, therefore, that the 2d and 3d assignments of error are not sustained.

The objective point of inquiry, on the part of the jury was

as to the mental condition of Wirebach, on the 7th day of December 1876; the testimony as to his condition, before and after that date, was only important as it shed light upon his condition at that time. As sanity is the normal condition, the burden of proving mental unsoundness is always upon those who allege it; if however general or habitual unsoundness of mind be once established, the burden of proving a lucid interval or a restoration, at any particular time, is thrust upon those who allege the fact. The learned court was of opinion however, and so instructed the jury, that there was not sufficient evidence, from which the jury could find a general state of unsoundness during the year 1876 and prior to Dec. 7, 1876 the date upon which the note in suit was indorsed. To the same effect was the affirmance of the plaintiff's 8th point: " The testimony of the defence relates to isolated conditions of mind during 1875 and part of 1876, and, even if believed by the jury, is too weak and inconclusive to establish habitual unsoundness of mind during these years." This instruction was in conformity with the former rulings of this court, and was certainly as favorable to the cause of the plaintiff, as they could expect. The evidence of Wirebach's mental condition during the years 1875 and 1876, was but fragmentary in its character; it disclosed at the best merely isolated and distinct instances, at intervals, of alleged mental disturbances. The testimony was not of that kind, which exhibited his condition continuously during those years, by an attendant, or by persons familiar with his every day life and condition, and the insanity alleged was not of that bold type which would clearly define lucid intervals. Considerations of this character doubtless led the court to say, that the testimony was too weak and inconclusive to establish habitual unsoundness of mind during the year 1875 and 1876. The effect of this instruction was to leave the burden of proof where it primarily belonged. If the facts shown did not establish habitual unsoundness, they were still proper for consideration upon the main question, the decedent's mental condition at the time of the endorsement. The state and condition of a person's mind is proven as any other fact, and his conduct for a reasonable time both before and after the act done, is admissible for that purpose. That conduct may embrace simply isolated instances, at considerable intervals, acts apparently inconsistent with sanity at the time, too inconclusive, either to found an opinion upon or to establish general insanity, nevertheless, these isolated circumstances are material as far as they shed light upon his mental condition at the time the act was done.

The court was requested to charge the jury, that under the law and the evidence they should find for the plaintiff. This

instruction the court declined to give, and the refusal so to charge constitutes the last assignment of error. The doctrine that when there is a scintilla of evidence of a material fact the question must be submitted to the jury, is not now recognized as the law of this state. "The more reasonable statement of the rule," says SHARSWOOD, J., in Howard Express Co. *v.* Wile, 14 P. F. S., 201, "is, that when there is any evidence which *alone* would justify an inference of the disputed fact, it must go to the jury, no matter how strong or persuasive may be the countervailing proof." To apply this rule, we must take that part of the testimony relied upon by the defendants alone; if, taken alone, it is insufficient to authorize an inference of mental incapacity, then there is really no evidence upon which, in law, a finding of that fact can be supported; insufficient evidence is, in the law, no evidence at all, and, in such case, it is the clear duty of the court, when so requested, as matter of law, to take the case from the jury. The language of the court, in Howard Express Co. *v.* Wile, supra, is clear upon this point:—"Evidence may be legally admissible as tending to prove a particular fact, which yet by itself is utterly insufficient for the purpose. It may be a link in the chain, but it cannot make a chain unless other links are added. Where successive juries, from prejudice against one party or sympathy for the other, persist in finding verdicts wholly unwarranted, must the court permit palpable injustice to be done? If a verdict is contrary to the charge of the court, on a question of law, it must be set aside whether it be the second, or the second hundredth. Where evidence on both sides is to be weighed, so as to determine on which side the scales incline, the jury is the appropriate tribunal. But when the weight on one side is of such a character as not to incline the beam at all—what the civilians term a mere *adminiculum*,—good to help something else, but nothing in itself,—nothing but a conjecture, then, it is as much a question for the court as if even this scintilla was absent."

In the case at bar, there is evidence on the part of the defendants which, taken alone, would justify the belief that the decedent was, at the time of making this indorsement, suffering from the effects of at least two strokes of paralysis; that this disease is due to an affection of the brain, the result of pressure by blood clot upon the brain surface; that the mental powers depend upon the integrity of the brain, and that injury to the mental faculties is in direct proportion to the damage done to the brain structure. It is in evidence that the decedent had, at the time, the shambling, shuffling gait, twisted mouth, indistinct articulation in speech, and peculiar facial expression, incident to the disease. From this

physical appearance, and his conduct from time to time as detailed by those who had seen him, the opinion of at least two of the expert witnesses was that he was suffering from cerebral paralysis. A large number of witnesses were called, however, to show the extent or degree of mental impairment; they testified to a great variety of facts and circumstances tending to show that, although previously a man of much business capacity and experience, he had become incompetent to discharge the most ordinary business affairs. It is unnecessary to refer to these facts in detail,—some of them were certainly very trivial, and taken singly were altogether inconclusive,—but from the whole taken together, and alone, the jury might fairly infer the fact of mental unsoundness; it is by this character and quality of evidence the condition of the mind is ordinarily shown; the evidence is perhaps not strong, but in the absence of countervailing proof it cannot be doubted that the inference of mental incapacity to transact business was legitimate and reasonable; upon the hypothesis of these alleged facts, two of the medical experts testified that such a degree of unsoundness was established as rendered him unfit to transact business, or to appreciate or understand the nature and effect of a contract of endorsement. Four others of the defendant's witnesses testified, from facts known to them personally, and which they stated as the basis of these opinions, to the same effect.

It is true, there is much to rebut this inference. The alleged lunatic was the owner of valuable property, over which, without restraint, he exercised full dominion; he was the president of a street passenger railway company in Easton, and served the company in that capacity; he voted at the elections; he made contracts; was examined as a witness, and testified with seeming intelligence, &c., but with the preponderance of the testimony we have nothing to do; the weight of the testimony was for the jury. We cannot consider the case as upon a motion for a new trial; the only question for this court to consider is, as to the sufficiency of the facts, shown by the defendants, to rebut the legal presumption of sanity; the character of the witnesses, and their credibility, was for the jury. Three verdicts have already been recorded for the defendants upon evidence substantially the same; three times has the case been considered in this court, and it is certainly late in this litigation now to discover that there is no evidence to justify a submission to a jury.

The question for the jury to determine was, whether Mr. Wirebach was of unsound mind on 7th December, 1876, the evidence given of the state of his mind, before and after that date was, as we have already said, important only as it tended

[Shafer's Appeal.]

to show his condition on that day. The testimony of Lehr, Fackenthal and Stout, as to his mental condition on the 6th, was in view of its reference to matters occurring on the day previous to the indorsement, and of the admitted capacity of the witnesses to judge, of the greatest importance; the learned court in the charge was most explicit and emphatic in declaring its importance, but it was evidence in rebuttal, and was wholly for the consideration of the jury. Much as we may doubt the correctness of the findings of the jury, as matter of law, we cannot say that the verdict should have been for the plaintiff.

The judgment is affirmed.