# Wirebach's Executor *versus* First National Bank of Easton.

1. An accommodation endorser of a promissory note, who receives no benefit therefrom either to himself or his estate, may defend against a bona fide holder on the ground that he was *non compos mentis* at the time of the endorsement; and this though the holder had at the time of the transfer to him no knowledge of the endorser's lunacy.

2. Fraud is not to be inferred from the mere fact of a person, weak both in body and mind, indorsing for accommodation.

3. The fact that a person drawn as a juror is the second cousin of the husband of a daughter and legatee of the defendant's decedent constitutes good cause for principal challenge by the plaintiff. But if the plaintiff challenge said juror to the favor and by agreement of the parties triors be dispensed with and the question be submitted to the court, its decision rests upon the court's conscience and discretion and is not reviewable.

4. Kind of evidence the admission or rejection of which is most properly left to the discretion of the court below, commented on.

April 1st 1881. Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, TRUNKEY, STERRETT and GREEN, JJ.

Error to the Court of Common Pleas of *Northampton county*: Of January Term 1881, No. 78.

Assumpsit, by the First National Bank of Easton, Pa., against Urbanus Wirebach, surviving executor, &c., of Jacob C. Wirebach, deceased, upon a promissory note, dated December 7th 1876, for $10,075.92. drawn by Richards & Christman to the order of Jacob C. Wirebach and endorsed by him.

When the case was called for trial, before MEYERS, P. J., one Daniel E. Richards was drawn as a juror. Being examined on his *voir dire* (the appointment of triors being waived by agreement), he testified that he was second cousin of Daniel W. Richards, a son-in-law of Jacob C. Wirebach. The plaintiff thereupon challenged him to the favor, and the court sustained the challenge against the objection of the defendant. Exception.

The evidence showed the following facts: The note in suit was

given December 7th 1876, to take the place of eleven promissory notes, dated in January 1876, held by the said bank, of which W. U. Stocker & Co. were the makers. On some of these notes, amounting to $4700, Joseph Richards, Charles Christman and Jacob C. Wirebach were joint accommodation endorsers, and on the rest of said notes, amounting to over $5000, Joseph Richards and Charles Christman only were accommodation endorsers. Charles Christman, called by the defendant, testified that at the time this arrangement was entered into one or more of the Stocker notes, on which Richards and Christman were the sole endorsers, had gone to protest and others were about to fall due ; that Stocker & Co. were in failing circumstances; that he, Christman, made the proposition to Mr. Forman, the president of the bank, to give a single new note drawn by Richards & Christman, and endorsed by Wirebach, in place of the eleven old ones, as it would be more convenient to pay the discount on one note and at one time than to pay at different times on a series of renewals ; Mr. Forman said they would take a new note with Wirebach as endorser. Christman then had an interview with Wirebach, which he described thus : " We talked the matter over and something was said about the notes having gone to protest, and then I asked him whether he would go as endorser and we as makers of the note—Richards and I—and he agreed to it, and I said that Mr. Forman would give us a couple of years' time if we held the note good, and I told him that. He said he would do it—go our endorser, provided his family should know nothing about it; and I mentioned the day when I would be over, and he should come along to the bank. Mr. Forman said I should try and bring him along, so that he could sign the note there in the bank."

On the appointed day Christman and Wirebach met, as agreed on, and drove to the bank. The president explained to Mr. Wirebach about the transaction and discount, and produced the note, which was then executed by Wirebach as accommodation endorser, and the other notes handed over to Christman.

Christman further testified on cross-examination : Q. Did it appear to you, at the time the note was executed, Wirebach had the palsy? Objected to. Objection overruled. A. That I couldn't say. I was examined in this case before. Maybe I did say I considered he had the palsy. I said his speech was certainly not the same; he couldn't talk very easy. Very likely I did say I could see he was suffering with palsy. Likely I did say on the former trial that anybody who knew anything about him could see he was suffering with palsy. I said I had seen him write before he was afflicted with the palsy. I said now I thought he had palsy then, but his speech was thick on that day. I had known him a good many years. He was very different from what he had been some years before. When he signed the note nobody steadied

[Wirebach *v.* First National Bank.]

his hand. I had seen him write before. His hand was tremulous that day. He walked weakly. He had a cane. He did not walk like he used to walk years before. He walked by himself up the bank aisle. There are some steps in the bank; he walked up those steps himself. It was talked that he would fix it all in one note. I told Mr. Wirebach for one. Forman had the note read, and told me to sign it first, then Wirebach. I can't say whether Forman showed the old man or not where to sign it. He signed on two places. He was the accommodation endorser. One of the notes was protested and a couple would be protested in a couple of days—that is, the Stocker notes would be protested. Stocker & Co. were good for nothing. Forman filled up the note. I think it was filled up before he got there. It was said he should go on the note until we could sell the Stocker property and raise money. I think he put glasses on when he signed the note. We were in the bank fifteen or twenty minutes."

Much evidence was produced by the defendant in support of the claim that Wirebach, at the time of the execution of the note, was *non compos mentis*; and that his appearance and general manner was such that no one transacting business with him at the date of the note in suit could fail to observe his physical weakness and mental imbecility. It was shown that he was seventy years of age; that he had an attack of paralysis in 1872 or 1873, a second attack in 1875, and a third attack after the date of the note, from the effects of which he died in May 1877. There was some evidence that he suffered from delusions, loss of memory and inability to comprehend ordinary business transactions.

The evidence as to the degree to which Wirebach's appearance and manner were affected by his malady, and the effect thereby produced on his acquaintances and others as to his sanity and business capacity, was very conflicting. Several witnesses testified that they saw Wirebach and transacted business with him up to the day before the note was signed; that they saw that his face was distorted, but he appeared perfectly rational and capable of contracting intelligently, and that there was nothing to indicate that he was of unsound mind. Other witnesses testified to a contrary effect.

The defendant presented, inter alia, the following points:—

1. If the jury believe that at the time of the execution of the endorsement in suit Jacob C. Wirebach was a man of unsound mind, and by reason of mental unsoundness was unfit to transact business or make a contract, the verdict must be for the defendant. Ans. " Not affirmed."

3. If the jury believe that at the time of the execution of the endorsement in suit Jacob C. Wirebach was a man of unsound mind, and by reason of mental unsoundness was unfit to transact business or make a contract, and such mental unsoundness was not

1 OUTERBRIDGE—35

[Wirebach *v.* First National Bank.]

only easily detected, but was plainly apparent from his appearance and conversation, and that the president of the bank saw the decedent at and immediately before the time of the execution of the endorsement, and could, by the exercise of due diligence, have ascertained his mental condition, the verdict must be for the defendant. Ans. "If the jury find, from all the evidence in the case, that the mental unsoundness of Wirebach, referred to in the point, was plainly apparent, from his appearance and conversation, to all persons with whom he came in contact, and by them easily detected, then, subject to this qualification, the point is affirmed. If, however, the jury find that Wirebach's mental unsoundness was not plainly apparent, from his appearance and conversation, or was not apparent at all to every person with whom he came in contact, then the president of the bank was under no obligation at the time of the endorsement of the note by Wirebach to exercise any diligence for the purpose of ascertaining his mental condition at that time, unless the jury find that Wirebach's mental unsoundness was in fact from his appearance and conversation plainly apparent to the president of the bank."

7. If at the time of the endorsement the officers of the bank knew that Jacob C. Wirebach was of weak or imbecile mind and easily influenced and imposed upon, and the bank, through its president, procured the endorsement to be made by said Wirebach, and the said contract of endorsement was rash, improvident or unconscionable, there can be no recovery upon said endorsement, and the verdict must be for the defendant. Ans. "Not affirmed."

The court charged the jury, inter alia, as follows :—

"The defendant has interposed a twofold defence to the payment of the note—1st. That there was a fraudulent contrivance on the part of the bank and Charles Christman, by which Wirebach was induced to endorse the note; and, 2d. That Wirebach at the time he endorsed the note was of unsound mind and incapable of making a binding contract.

"On the question of fraud, we say to you that fraud must be proved; it cannot be presumed. [We have endeavored to ascertain whether there is any evidence in the case on the question of fraud, misrepresentation or undue influence on the part of the bank that would authorize us to submit that question to you for your consideration. We fail to find any such evidence in the case.] * * *

"It is contended by the defendant that if, in point of fact, Wirebach was of unsound mind at that time there can be no recovery by the bank against the defendant, *whether there is or is no evidence that the bank had notice or knowledge of such unsoundness.* I recognize to some extent the peculiar language used by our Supreme Court in the several cases bearing on the proposition, and

[Wirebach *v.* First National Bank.]

that possibly the doctrine may be deduced from those cases that there is a distinction between the case of an accommodation-endorser, who has received no money or value under and by virtue of his contract of endorsement, and a case where the maker or endorser receives value. A careful examination of the cases has led the court to this conclusion : that the principle underlying the decisions in these cases is not clearly inapplicable to the case now under consideration, and [we therefore charge you, as the law of this case, that *it is not sufficient* for the defendant to relieve himself from the responsibility of paying the note by merely proving that at the time when the note was endorsed by Wirebach he was of unsound mind, *but he must further prove that the bank had notice or knowledge of such unsoundness.*] The contract of endorsement by Wirebach, so far as the bank is concerned, is an executed contract. At the time the note in suit was given the bank held eleven notes of which W. U. Stocker & Co. were the makers. On some of the notes Richards & Christman were sole endorsers; on the rest, Richards, Christman and Wirebach were joint endorsers. One or two of the notes were overdue; and the rest had not yet matured. The note in suit was given in place of the eleven notes, at a longer period, with different makers and endorsers. When the new note was given and the old notes surrendered by the bank, that made the contract of endorsement by Wirebach on the new notes, so far as the bank was concerned, an executed contract.

" If the court is in error on the question of notice or knowledge, such error will be speedily corrected by the Supreme Court. [To entitle the defendant to a verdict in this case, he must establish by satisfactory evidence that Wirebach was of unsound mind on the 7th of December 1876, and that the bank had notice or knowledge of such unsoundness of mind.]

" If the defendant has satisfied you, by the weight of evidence, that Wirebach was on that day in fact insane and incapable of comprehending the nature, character and consequences of his contract of endorsement, then your next inquiry will be, had McEvers Forman or John F. Gwinner, the president and cashier of the bank, notice or knowledge of his unsoundness of mind. The only testimony of notice is that of Charles Christman. * * * The defendant claims that there was constructive notice—that is, there was enough in the appearance of Wirebach, considering the fact that he was a paralytic. If you should find that to be so ; that this condition manifested itself more or less all the time ; that there is a reasonable presumption that it existed on that day ; and, if it did, that then Forman, though he may not have been completely satisfied of Wirebach's mental condition, yet it was his duty to make inquiry."

Verdict for the plaintiff of $11,972.73, and, a rule for a new

trial having been discharged, judgment thereon. The defendant took this writ of error, assigning for error, inter alia, the answers to points, the portions of the charge above quoted in brackets, and the ruling sustaining the challenge of plaintiff to the juror, Daniel E. Richards.

*Edward J. Fox* (*W. S. Kirkpatrick* with him), for the plaintiff in error.—The court below, in deciding that a lunatic may make a valid accommodation endorsement, went a step beyond any prior decision. No case has ever gone further than to hold that when the estate of a lunatic has had the advantage of the contract, the contract shall be sustained. Where the contract is without consideration, we contend that it is only necessary to prove insanity or incompetency to contract: Lancaster Bank *v.* Moore, 28 P. F. Smith 407; Snyder *v.* Laubach, 7 W. N. C. 464; Moore *v.* Hershey, 9 Norris 196. The doctrine laid down in answer to our third point, and in the general charge, that in such case notice or knowledge of insanity must be proved, is erroneous: Allore *v.* Jewell, 4 Otto 500.

*W. W. Schuyler* (*William Muchler* with him), for the defendant in error.—To avoid a contract made by a lunatic, something more than the mere fact of lunacy must be established. In drawing the line between the valid and voidable contracts of a lunatic, two sets of interests must be kept in view. In the first place, the helpless condition of the lunatic commends him peculiarly to the protection of the court, and in the second place, the public has rights which even a lunatic is bound to respect. The courts have heretofore been not a little embarrassed in their efforts to formulate a general rule by which both of these sets of interests would receive their due share of protection, and more especially where it has been necessary to pass upon the liability of a lunatic as *maker*. *or endorser of commercial paper* in the hands of a bona fide holder for value and without notice of the lunacy. But this court has very recently announced a rule, at once clear, concise and comprehensive which affords protection both to the lunatic and the public; not absolute protection, it is true, but the utmost protection of which the nature of the case is susceptible. In Moore *v.* Hershey, 9 Norris 196, Mr. Justice PAXSON says: "The true rule applicable to such cases is, that while the purchaser of a promissory note is not bound to inquire into its consideration, he is affected by the status of the maker—as in the case of a married woman or a minor. In neither of these cases can he recover against the maker. *In the case of a lunatic, however, he may recover, provided he had no knowledge of the lunacy, and the note was obtained without fraud, and upon a proper consideration.*

[Wirebach v. First National Bank.]

But the lunatic or his committee may defend upon either of these grounds."

The equitable principles upon which the rule as here laid down is based, have frequently been recognised : LaRue v. Gilkyson, 4 Barr 375 ; Beals v. See, 10 Id. 56 : Lancaster Co. Bank v. Moore, 28 P. F. Smith 407 ; Snyder v. Laubach, 7 W. N. C. 464; Molton v. Camroux, 2 Exch. 487, and 4 Exch. 77 ; Elliot v. Ince, 7 DeG., M. & G. 487 ; Story's Eq. Juris., sect. 228 ; Wilder v. Weakley, 34 Ind. 181 ; Benjamin on Sales, sect. 29 (Amer. ed.) The note in suit was obtained " upon a proper consideration." In exchange for the endorsement of Mr. Wirebach, the bank surrendered the Stocker notes, on which Wirebach was liable as endorser, and additional time was given. That the decision goes further than any reported case, is no argument against it, but is the more to the credit of the court who made it, if it accords with well established equitable principles. As between Mr. Wirebach's representatives and the bank—an innocent party, who discounted the note in the regular course of business—the equity is with the latter : Ex parte Hall, 7 Vesey 264.

The challenge to the juror was properly sustained on the authority of Rank v. Shewey, 4 Watts 218, and Harrisburg Bank v. Forster, 8 Watts 304.

Mr. Justice TRUNKEY delivered the opinion of the court, May 2d 1881.

Where a person fairly and in good faith, sells property or loans money to a lunatic who appears to be sane and is not known by the vendor or lender to be insane, and who has not been found to be a lunatic by judicial proceedings, and the lunatic receives and uses the same, whereby the contract becomes so far executed that the parties cannot be placed *in statu quo*, such a contract cannot afterwards be set aside, or payment refused by the lunatic or his representatives : La Rue v. Gilkyson, 4 Barr 375; Beals v. See, 10 Id. 56; Lancaster County Bank v. Moore, 28 P. F. Smith 407 ; Wilder v. Weakley, 34 Ind. 181; Elliot v. Ince, 7 DeG., M. & G. 475, 487. In Elliot v. Ince it is remarked that "the result of the authorities seems to be that dealings of sale and purchase by a person apparently sane, though subsequently found to be insane, will not be set aside against those who have dealt with him on the faith of his being a person of competent understanding." Chief Justice GIBSON based the lunatic's liability in such cases on the principle that where a loss must be borne by one of two innocent persons, it shall be borne by him who occasioned it ; he is liable to bear the consequences of his infirmity, as he is liable to bear his misfortunes.

There can be no binding executory agreement where one of the parties is bereft of reason : a capacity to contract is absolutely

[*Wirebach v.* First National Bank.]

necessary. An insane person is incapable of committing a crime or making a contract, yet it is common to speak of his torts and his contracts, and on many of them he is liable in a civil action. One who knowingly sells goods to an insane person, necessary for his use, may recover their value, on the same principle that an infant is liable for necessaries he purchases. His liability for necessaries and suitable articles, is deemed rather a benefit than a disadvantage to him.

It is noticeable that in this Commonwealth, where the lunatic has been held liable, there was neither imposition nor want of full consideration for the amount of liability, and when not for necessaries, the opposite party had no knowledge of the lunacy. Thus, in Lancaster County Bank *v.* Moore, *supra,* stress was put on the fact that the bank had no knowledge of Moore's insanity, and in good faith loaned the money which was placed to his credit and checked out by him. It was held to be within the doctrine of Beals *v.* See, that the contract was executed so far as the consideration was concerned, and that the rule which prevents insane persons obtaining the property of innocent parties and retaining both property and price, required payment of the note. Snyder *v.* Laubach, 7 W. N. C. 464, is where Yost's endorsement of the note was merely a renewal of an endorsement made when he was unquestionably of sound mind; and it was held that he was clearly liable on the note of which the note in suit was a renewal; there was full consideration, and the case was within the decision of Lancaster County Bank *v.* Moore. The consideration was a debt for the amount of the renewal note. So in Kneedler's Appeal, 37 Leg. Int. 504, a judgment entered on a bond by virtue of a warrant of attorney was allowed to stand because the lunatic, acting by advice of counsel, received the full consideration which he prudently applied in payment of his undisputed debts, and the plaintiff had no knowledge of the insanity when the money was loaned. Of like purport are every one of the cases decided elsewhere, which are cited and relied on by the defendant in error. In most if not all cases where an insane person has been held answerable, as if his contract were binding, he received and enjoyed an actual benefit from the contract.

The question now presented is: Will an action lie on the accommodation endorsement of a promissory note by a lunatic? If the determination of this was not made, it was very clearly indicated in Moore *v.* Hershey, 9 Norris 196. There the action was by an endorsee against the maker of a promissory note, and evidence was offered to prove that the maker had received no consideration for the note, which fact the plaintiff had admitted in conversation, proof having been made that the maker was insane, but the offer was rejected, the court below ruling that as the note in suit was commercial paper and the plaintiff a holder for value,

[Wirebach *v.* First National Bank.]

the consideration could not be inquired into. This was held to be error. PAXSON, J., said " We place our ruling upon the broad ground that the principle of commercial law above referred to does not apply to commercial paper made by madmen. * * * The true rule applicable to such cases is, that while the purchaser of a promissory note is not bound to inquire into its consideration, he is affected by the status of the maker, as in the case of a married woman or a minor. In neither of these cases can he recover against the maker. In the case of a lunatic, however, he may recover, provided he had no knowledge of the lunacy, and the note was obtained without fraud, and upon a proper consideration."

" There must be a limit to the civil responsibility of persons of unsound mind, otherwise their property would be at the mercy of unscrupulous and designing men."

If the holder could recover against one who was insane when he endorsed or made the note without consideration therefor, no wider door could be opened for the swindler to despoil such helpless persons of their estates. An infant who makes or endorses a note may, by his representative, plead his infancy as a complete defence. In like manner a lunatic may plead insanity and want of consideration. The consideration respects himself, not the holder who may have given value to his endorser. If the fact that the holder had paid value were enough, the lunatic could not defend for fraud upon him or for want of consideration ; then an innocent holder could recover, though the judgment would sweep away the lunatic's entire estate, and he had not been benefited a farthing. Nor would a nominal sum be sufficient. It is said that the law protects those who cannot protect themselves, but it would be sorry protection, if one holding a valid note against a helpless man for four thousand dollars, could get it renewed for ten thousand dollars, and recover the full amount of the renewal note. The consideration must be fair and conscionable, and then it is proper. When it is a pre-existing debt, or money loaned, its measure is certain, and the insane man is liable for no more than the amount of such debt or loan. The holder of a madman's note stands in no better position than the payee. An accommodation maker or endorser, in fact, is a surety for the principal debtor, and when he is an infant or an insane person, he or his representatives may defend as in other forms of contract. We are not persuaded that commercial or public interests require an adjudication that a lunatic who signs a contract as surety, or as accommodation maker or endorser, is liable for the debt of another man.

This action is upon a note for $10,075.92, which was given to the bank to take up notes of Stocker & Co., which were endorsed by Richards and Christman. J. C. Wirebach was accommodation endorser, and this was known to the bank. He was an endorser on one of the former notes for $4400. It is alleged by the defence

[Wirebach *v.* First National Bank.]

that Wirebach was incapable of making a contract by reason of insanity, not only at the date of the note in suit, but also at the date of said former note. If this fact were established, the verdict should have been for defendant. And if he were sane when he endorsed the prior note, and insane at the time he endorsed the note in suit, he is not liable for the one in suit, as it is not a mere renewal note. The learned judge of the common pleas instructed the jury that " to entitle the defendant to a verdict in this case, he must establish by satisfactory evidence that Wirebach was of unsound mind on the 7th of December 1876, and that the bank had notice or knowledge of such unsoundness." We are of opinion that it was error to rule that the defence failed unless the bank had such notice or knowledge. This ruling pervaded the charge and answers to points; corrected, there is no occasion for special remark on each of the first nine specifications of error. We are not satisfied that the court erred in charging that there was no evidence of fraud, misrepresentations or undue influence on the part of the bank, or of fraudulent practices by Christman on Wirebach to authorize submission of these questions. Fraud is not to be presumed from the mere fact of endorsement, even by a man feeble in mind and body. It is common for one friend, though possessed of strong mind, to ruin himself financially by indorsing for another, and while it is very imprudent if not rash, it has never been considered unconscionable, except when procured by some artifice or fraud, of which there must be some evidence. Were the endorser weak-minded, less evidence would be required to establish the fraud.

Daniel E. Richards, one of the jurors, was challenged to the favor. It appeared that he was second cousin to the husband of a daughter and legatee of J. C. Wirebach, deceased. This was cause of principal challenge, which may be to the blood or kindred of either party within the ninth degree (3 Black. Com. 363). " And how far remote soever he is of kindred yet the challenge is good. * * * Affinity or alliance by marriage is a principal challenge, and equivalent to consanguinity where it is between either of the parties, as if the plaintiff or defendant marry the daughter or cousin of the juror, or the juror marry the daughter or cousin of the plaintiff or defendant, and the same continues or issue be had. But if the son of the juror hath married the daughter of the plaintiff, this is no principal challenge, but to the favor; because it is not between the parties. * * * Challenge concluding to the favor is, when either party cannot take any principal challenge, but sheweth causes of favor, which must be left to the conscience and discretion of the triors upon hearing their evidence, to find him favorable or not favorable." (Coke upon Litt. 157, *b.*) The challenge was expressly to the favor, and the fact submitted to the court instead of triors. This mode of determining the fact was

[Wirebach v. First National Bank.]

assented to by both parties, neither objected.   It was a question of fact to be decided on the conscience and discretion of the court, acting in place of triors, and the decision is not reviewable.   Cummings v. Gann, 2 P. F. Smith 484, is not in point, for in that case the jurors were challenged *propter affectum*.

None of the assignments relative to the offers of testimony by the defendant is sustained.   One is to the effect that the defendant was prevented from proving by Mr. Scott that Wirebach was a shrewd, intelligent business man prior to 1875.   Why the court overruled the direct question is not stated, but the witness was properly examined, and testified that Wirebach's manner of conversation was good, that he was a fluent talker, intelligent, had a good memory, and was an intelligent business man.   All of the witnesses were allowed to testify, so far as they knew, as to his appearance, manner, conversation and acts, before and after the commencement of his alleged unsoundness of mind.   Nor do we think that the insolvency of Richards and Christman, or the value of Wirebach's property at the date of the endorsement, or that Wirebach once took an interest in, and was well informed on political matters, were facts so strictly pertinent that it was error to reject them.   The admissibility of such facts depends much on other testimony in the cause, and most generally safely rests in the judgment of the court where the cause is tried.

The learned judge seems to have carefully considered his rulings, and to have fairly submitted to the jury to determine as to the alleged insanity of Wirebach at the time of the endorsement.   But for the single error relative to notice to, or knowledge by the bank of the insanity of Wirebach, the cause must go back for another trial.

Judgment reversed, and a *venire facias de novo* awarded.