NORMAN KING v. R. HUMPHREYS ET UX.

APPEAL BY PLAINTIFF FROM THE COURT OF COMMON PLEAS NO. 1 OF ALLEGHENY COUNTY.

Argued October 29, 1890—Decided November 10, 1890.

1. On the trial of an ejectment, brought by a brother claiming by descent from his deceased father, against his sister claiming under a deed from the father, evidence on the part of the plaintiff to show that when the deed was made the grantor was mentally incapacitated therefor, was properly submitted to the jury.
2. On such trial, it was not error to exclude the testimony of the plaintiff as to matters occurring prior to the death of his father, the grantor in the deed to the defendant, the witness being incompetent as to such matters under § 5 (e), act of May 23, 1887, P. L. 159.

Before PAXSON, C. J., STERRETT, GREEN, WILLIAMS, MC-
COLLUM and MITCHELL, JJ.

No. 91 October Term 1890, Sup. Ct.; court below, No. 715
June Term 1888, C. P. No. 1.

On June 1, 1888, a summons was served in an action of
ejectment, brought by Norman King against Robert Humph-
reys and Lilla M., his wife, to recover an undivided one third
interest in lots 4 and 5 in the plan of the extension of Stewarts-
town. Issue.

At the trial on January 24, 1890, abstracts having been put
in evidence, it was shown that Lewis King died intestate about
May 5, 1888, and that Norman King, the plaintiff, Lilla Humph-
reys, defendant, and Nancy J. Bingham were his children and
heirs at law, living at the time of his death. The plaintiff
then rested. The defendants put in evidence a deed from
Lewis King to Lilla M. Humphreys, defendant, dated May 24,
1886, and acknowledged and recorded the next day, which
deed, reciting a consideration of $2,000, it was admitted con-
veyed the lots in dispute.

In his rebuttal case, Norman King, the plaintiff, was called
and sworn in his own behalf. Objection being made to any
testimony by the witness as to facts occurring in the lifetime
of Lewis King, the objection was sustained; exception.[1]

The plaintiff then introduced testimony claimed to establish,
in substance, that lot No. 4 was worth about $3,000, and lot
No. 5, with a dwelling-house on it, at least $4,000; that the
consideration of the deed to the defendant, in evidence, was in
fact but $100 or $200; that, at the date of his death, Lewis
King was in the seventy-eighth year of his age, and at the date
of said deed and afterwards had made his home with the de-
fendants; that in June, 1887, he was declared a lunatic, the
inquisition finding that he was without lucid intervals from
January 1, 1887; that, also in June, 1887, he executed a will,
admission to probate of which was refused by the register after
a contest as to his testamentary capacity; and that for the
last four years of his life he was weak in mind and body and
incapable of transacting business.

At the close of the testimony, the court, STOWE, P. J.,
charged the jury in part as follows:

Charge of Court below.

The court is requested to charge on the part of the plaintiff:

1. The burden is upon the defendants in this action to show that the transaction was fair and honest.

Answer: Affirmed.

The defendants request the court to charge the jury:

1. That there is no sufficient evidence in this case to justify the jury in finding against the deed of Lewis King to Lilla Humphreys, on the ground of undue influence.

Answer: Affirmed.[11]

2. That under all the evidence in this case, the verdict must be for the defendants.

Answer: Refused.

This case has been somewhat tedious, but necessarily so. Cases of this kind, where a party's sanity is under investigation, without they are so clear that one who runs may read, involve consideration of all sorts of things, trifling apparently and unimportant, and an examination of a man's conduct for years, even for his whole life. Yet, when it is all put together, the question you are to decide is, not whether the man is crazy or not, but whether he was, if mentally unbalanced at all, so unsound of mind as to render him unfit to understand what he was about when he made the deed in controversy. . . . .

[The first point, however, to start more regularly in this case, is the question whether there was undue influence. I have told the gentlemen in advance, and I tell this jury, there is no evidence of undue influence. That must be understood by the jury, not as assuming there is no case for them to decide, possibly, in view of some other testimony that has been presented in favor of the plaintiff, but upon that question, which means that the party who got this deed made,—the wife, Mrs. Humphreys, or her husband,—at the time, or preceding the time, and extending up to the time that the deed was actually made, executed and delivered, had such a control over the mind of the old gentleman that they kept him in a sort of mental duress, so that when he did the act it was not his act at all, but was her act, or that of her husband acting for her. A man comes in to you, and with a pistol at your head makes you sign a check. The physical act is yours, but the mind does not go with it. That is what we call duress. That is a moral and physical duress, which relieves you from the effect of the act. You prove the fact, the law

Charge of Court below.

says you are not bound.   So a person, old and weak, and some-
times one young and weak minded, and, perhaps, strong minded,
influenced by certain relations, confidence in their children or
legal advisers or pastors, or others, may be so influenced as to
do an act they would not ordinarily have done and ought not
to have done; would not have done under other circumstances;
and, where the relation between the parties is such that it gives
them that control, and the act itself is unreasonable, and one
that ought not ordinarily, in the judgment of reasonable people,
to be done—property given away under circumstances that in-
dicated it ought not to be, in view of his relations to his family
and society, the law says that the transaction is not binding.
On that matter of absolute control, or actual duress, or undue
influence, there is not any evidence on which the jury have a
right to pass, or on which, if the jury would find a verdict, we
could allow it to stand.   That is out of the case.] [12]

But there is, however, another matter in this case, which is
for the consideration of the jury.   Whatever view you may
come to with reference to that, for the present at least, is to be
binding upon the court, and that is, whether this giving of the
property to Mrs. Humphreys here for the sum of $100 or $200,
apparently $100, was a reasonable and fair act on his part, in
view of what she had done for him, the way she had been act-
ing and treating him, considering the property he had left, and
the conduct of the other children, and his disposition to reward
her for her kindness.   That is, perhaps, after all a question that
will have to be decided eventually, and more certainly by the
Supreme Court, if it should ever go there, whether or not there
is sufficient evidence to justify a jury in finding in this case it
was an unreasonable arrangement or gift, but for the present it
must be submitted to the jury.   On that question you will have
to consider all the testimony.   I am assuming, for the present,
he was of competent, disposing mind and memory.   Assuming
there was no undue influence brought to bear on him, because
there is no evidence of any, but simply treating this as a trans-
action by a reasonable, intelligent man, having full opportunity
to do as he pleased, and having this property, whether giving
it to the daughter, as he did by this deed, was such an unrea-
sonable, unbecoming and improper act on his part, as would
justify the jury in finding that there was some fraud or improper

Charge of Court below.

conduct used, something for which the jury would say it ought not to be allowed to stand; or, in other words, if a chancellor had it before him now, he would not allow it to be carried out. . . . .

You take into consideration, so far as the evidence gives you power to do it, how much the ground was worth. He did not give all his property away. He gave a portion of it;—he was working at the time. [To one son he had already advanced,—and to the plaintiff, too, in this case,—a considerable sum of money. He seems not to have had the most implicit confidence in him, because when he came to make his will, which was afterwards set aside for some reason or other, he, as to the other property, undertook to vest what interest would otherwise go to him in his children.] [13] He had been living with this daughter, the defendant, a number of years. You have heard the evidence indicating her treatment and conduct. Assuming him to have been perfectly sane, in his right mind and capable of making a contract, was this gift, apart from further consideration, such an unreasonable one as would justify you in considering the act as a fraudulent one; that some imposition,—not undue influence, but an imposition,—had been practiced on him, or some advantage taken of him which was unfair and unreasonable, that induced him to make this transfer or deed? If there was, you ought to find a verdict for the plaintiff. If the evidence does not satisfy you of that, you ought to find a verdict for the defendants upon that point.

But there is another question, and that is the one which has been most earnestly argued to you: that this old gentleman was insane. Now, as I have said before, if he was more or less affected mentally, if it did not interfere with his ability to understand his property, his relations to his business; if he was not so that he did not appreciate fully his relation to his affairs and life, able to comprehend what he was about fairly and reasonably, yet nevertheless was affected otherwise, it would not justify the jury in finding a verdict for plaintiff on the ground of insanity. The mind must be so affected as to at least disturb and interfere with his appreciating what he was doing. Upon that subject you have a great mass of testimony offered, particularly by the plaintiff; and the most of it, nearly all of it, related to long after this transaction, or a considerable

Charge of Court below.

length of time after it.    Starting with Decoration Day he seems to have had, according to the theory of the plaintiff, a sudden increase of these symptoms indicating what they call softening of the brain ; and, according to others, nothing more than, perhaps, a little difficulty that arose, passed away quickly, and did not leave any permanent traces behind for some time.   If he had been insane as anybody in Dixmont, without an attempt were made to show the jury his condition a week or ten days before he made this deed, it would not have any bearing at all on the case.   Though I may go crazy to-morrow, show I am insane, manifest unmistakable symptoms of insanity, yet if able to do what I am doing now, if I can attend to the ordinary affairs of life, if I am fully, to all appearances, rational and in my right mind, it would be absurd to say because I had a general stroke of paralysis, or from some other unforeseen cause, I become a raving maniac to-morrow and have to be carried to Dixmont, that the charge, or the deed, I had made to-day was bad.   That is not the law.   [The subsequent acts are to indicate the previous state of mind, and a man's capacity is not to be treated on the scientific theories of experts, and say a man was crazy a year ago because he has softening of the brain to-day, or because he had softening of the brain incipient or to a considerable extent before.] [14]

It is no doubt, an insidious disease of slow growth ; and to everybody's observation a man may be affected more or less at one time with that disease, and yet be as competent to attend to business as any of us are ; and so it becomes like epileptic fits.   It more or less affects the mind ; and every accession of the disease or exacerbation may be indication of a certain development, of its coming to a certain point in the continuous growth ; but, until you get to a certain point, the man may be, at least bodily, and the mind to some extent, affected, and yet he be competent to transact his ordinary business as well as anybody.   The point of this is, that although this man may not, but assuming he did have (which is denied) trouble with his brain, softening of the brain, preceding this deed, yet if it was not of such a character and did not go to such an extent as to unfit him for ordinary business, comprehending the ordinary relations he had to his affairs and life, and his duty to society, it would not be sufficient to set this deed aside.   If, however, you think that it

went to that extent, and that in making this deed he was not fully conscious what he was about, not rational enough to transact the ordinary affairs of life, of course the deed falls. . . .

The jury returned a verdict in favor of the defendants. Judgment having been entered, the plaintiff took this appeal, assigning for error:

1. The refusal of the plaintiff's offer.[1]
11. The answer to the defendants' point.[11]
12–14. The portions of the charge embraced in [ ] [12 to 14]

*Mr. F. C. McGirr* (with him *Mr. W. D. Moore*), for the appellant.

Counsel cited: (1) Section 5 (*e*), act of May 23, 1887, P. L. 159; Bowen v. Goranflo, 73 Pa. 357; Frew v. Clarke, 80 Pa. 170; Karns v. Tanner, 66 Pa. 297. (12–14) Worrall's App., 110 Pa. 349, 356; Greenfield's Est., 14 Pa. 489; Henderson v. Hays, 2 W. 157; Miskey's App., 107 Pa. 612; Darlington's App., 86 Pa. 512; Newhard v. Yundt, 132 Pa. 324.

*Mr. H. T. Watson* and *Mr. John S. Ferguson*, for the appellees, were not heard.

PER CURIAM:

We find no substantial error in this record.

Judgment affirmed.