# C. C. ELCESSOR ET AL. v. MARY ELCESSOR.

|146  359|
|165  604|

## APPEAL BY DEFENDANT FROM THE COURT OF COMMON PLEAS NO. 2 OF ALLEGHENY COUNTY.

Argued October 27, 1891—Decided January 4, 1892.

1. To overcome, on the ground of mental incapacity, the deed of a husband conveying as a gift to his wife a not undue portion of his estate, drawn by counsel, executed openly in the presence of one of the plaintiffs, acknowledged before a notary who had known him for many years, without coercion, collusion or fraud, the evidence should be clear and unquestionable.

2. On questions of mental incapacity, as affecting the validity of a deed as of a will, the opinions of non-expert witnesses are inadmissible, until they have first stated facts from which the weight of their opinions may be determined; and those facts must be such as to afford a fair basis for the opinions proposed to be given.

3. When the facts first stated, as such basis, are in themselves inconclusive, and of such neutral character as to be consistent with either soundness or unsoundness of mind, they cannot reasonably be assumed as a proper foundation for the opinion offered, and the opinion of the witness should be excluded.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 80 October Term 1891, Sup. Ct.; court below, No. 362 July Term 1889, C. P. No. 2.

Returnable to the first Monday of July, 1889, C. C. Elcessor and others brought ejectment against Mary Elcessor, for a lot of ground in Allegheny City.   Issue.

At the trial, on October 6, 1889, the plaintiffs showed title to the lot in controversy in Lewis Elcessor, who died intestate on May 7, 1889, leaving to survive him his widow, Mary Elcessor, the defendant, and the plaintiffs, who were his children by two former marriages.   There was no issue of the decedent's last marriage.   The plaintiffs having rested, the defendant gave in evidence a deed for the property in dispute from Lewis Elcessor and his wife, the defendant, to J. W. Keffer, dated March 12, 1889, duly recorded; and a deed for the same pro-

perty, dated the same day, from J. W. Keffer and wife to Mary
Elcessor, the defendant, duly recorded.

The defendant having rested, the plaintiffs, with other testi-
mony to show the mental incapacity of Lewis Elcessor at the
time of the foregoing deeds, called Reuben Logan, who testi-
fied that he had been acquainted with Lewis Elcessor for over
forty years; that he was a boss plasterer, and fifteen or twenty
years ago had the name of being a very shrewd dealer; that
for the last few years of his life he was not doing any business,
unless in dealing a little in pork or grain; that the witness
went with him to "places" on two or three occasions, but Mr.
Elcessor never invested; that in the latter years of his life he
"looked very different from the former part of his life;" and
that the witness had seen him crying, dozens of times.

"Q. In your judgment, the last year of his life was he of
sound or unsound mind?"

Objected to, that the witness had disclosed no facts to jus-
tify him in expressing an opinion.

By the court: Objection overruled; exception.[4]

"A. You mean in business? Q. Yes, sir. A. I think not,
sir. Q. Why was he not fit to do business? A. Well, from
the fact that he would ask the same question over three or
four different times on the same subject; he would ask you a
question and get the answer, and then ask the same question
over again afterwards repeatedly; that is why I think he was
not fit to do business."

John Alston, called for the plaintiffs, testified that he went
to work for Lewis Elcessor, had lived with him for eight or
nine years, and had known him for eighteen years:

"Q. Did you see him in the latter years of his life? A. Yes,
sir; I passed him frequently on the street. I think the last time
I spoke to him was about the first of March, or the last part of
February. I was going up along Dawson street; and at the
park I caught up with him, and walked up to him and stuck
my arm in his and walked the same way he was going; and he
turned around and spoke to me and asked me how I was get-
ting along. He was very slow in talking and was walking
very slow, and I suppose it took us ten minutes to walk up to
Webster street; and he asked me how much work I was doing
and how I was getting along; and when we got within three

or four doors of Irwin Avenue, he asked me where I was going, and I said, down to the barn there, and he turned around to me and he says 'Who are you?' and I says 'Johnny Alston;' and he turned around and shook hands with me and asked me the same things over again; how I was getting along and whether I was doing as much work as he did before, and I walked along and he kept up the street. I met him in the street frequently and spoke to him, and he would speak to me and call me by name; other times he would be looking right at me and wouldn't answer when I spoke, and walk along. Q. Did you ever have any conversation with him? A. I don't think I did, any more than to give him the time of day. I spoke to him once in the Diamond, and asked him how he was getting along; and another gentleman came up and spoke to him and he went off with him. Q. Can you recall any subject of conversation you had with him during the last year or two of his life? A. Only this one, when he asked me how I was getting along and I thought— Q. How did he go along the street the last year of his life? A. Very stupid, very slow. It used to be, when I walked with him on the street, when I learned my trade with him, it would keep me running to keep up with him; and that day he was going along stoop-shouldered, and weak and trembling like. Q. From your observation of this man and his conversation, was he of sound or unsound mind and fit to do business the last year of his life?"

Defendant objected, on the ground that the witness had not testified to sufficient facts to warrant an opinion.

By the court, to plaintiff's counsel: "I do not think it would be safe, if there should be a verdict for you.'

By Mr. Marshall: "We will risk it."

By the court: Objection overruled; exception.[5]

"Q. At the time you saw him and talked to him, in the latter part of February or the first part of March, 1889, from his appearance and conversation, in your judgment was he fit to do business; of sound or unsound mind? A. My opinion of him at that time when I saw him, his memory, from what he had been when I had a great deal of dealings with him, had failed wonderful, and he was about as great a changed man as ever I knew, because he would come right at me with the same question over and over. Q. Was he fit to do business, in your

judgment ?   A. In my judgment at that time, I don't think he was."

There was testimony that the property in dispute was worth six or seven thousand dollars, but was mortgaged for two thousand dollars; and that Lewis Elcessor died seised of other real estate in Allegheny City.

At the close of the testimony, the court, EWING, P. J., charged the jury in part as follows:

In determining a question about which there has been a great deal of testimony, and a great deal of it that is probably of not very much importance in the case, it is important to exclude from consideration things that are not in the case.

Now, first, you and I are not to make a will for Lewis Elcessor; we are not to distribute his property. That is not to be considered; and whether or not it is a just distribution—too much or too little for this woman—you and I have nothing to do with; because, from the admitted testimony it is not a case of a man divesting himself of his whole property; and as a matter of law no court would say, or could say, that it was an undue provision to make for a wife, provided he made it, was competent mentally to make it, and made it of his own will. Now, bear that in mind, and divest yourselves of any idea that you are to be controlled by what you think is the justice or injustice of this act; because, a man has a right, if he is not defrauding his creditors, to give away his property, and has a right to will it as he pleases. It is his legal right, and the business of courts and juries is not to make laws nor to distribute estates against the will of the owner. In the next place, the relation of husband and wife is a lawful one, a proper one, a holy one; and there are influences that can be brought to bear on the husband by the wife, or the wife by the husband, that the law recognizes, and that they may do properly without avoiding a deed or a will, that a stranger could not do. The question you are to determine is, whether or not Lewis Elcessor, at the time he made this deed, was mentally competent to execute a deed for the property: . . . .

—The jury returned a verdict for the plaintiffs. A rule for a new trial having been discharged, the defendant took this appeal, assigning for error inter alia:

4, 5. The admission of the plaintiffs' offers.[4] [5]

*Mr. J. S. Ferguson* (with him *Mr. E. G. Ferguson* and *Mr. J. A. Emery*), for the appellant.

Counsel cited: Dickinson v. Dickinson, 61 Pa. 401.

*Mr. Thos. M. Marshall* (with him *Mr. D. M. Alston*), for the appellees.

Counsel cited: Irish v. Smith, 8 S. & R. 572, 581; Rambler v. Tryon, 7 S. & R. 90; Wilkinson v. Pearson, 23 Pa. 117; Bricker v. Lightner, 40 Pa. 199.

OPINION, MR. JUSTICE MITCHELL:

The learned judge, during the course of the trial, admitted a good deal of testimony that he subsequently characterized to the jury as "probably of not very much importance in the case," and some apparently against his own judgment, out of regard to the urgency of counsel who assumed to "risk it." It is true that he cautioned the jury as to the weight of such evidence, and told them in correct and explicit terms that they were not to distribute Lewis Elcessor's property for him, but to determine if the deed was his own act. But, unfortunately, to re-distribute a man's property after he is dead, in a manner different from that which he has chosen to do for himself, is one of the things that few juries can resist if they are allowed an opportunity; and this is a class of cases in which the jury must not only be held with a strong hand to a decision in accordance with the evidence, but also in which care must be taken not to give them a chance to decide, except upon evidence strictly competent. The present is the case of a deed from the grantor to a third party, for the purpose of reconveyance to the grantor's wife, drawn by counsel, acknowledged before a notary who had known the grantor fourteen or fifteen years and who explained the effect of the deed at the time, and executed openly in the presence of one of the plaintiffs. There was no evidence of coercion, fraud, collusion, or even secrecy about it, and it was attacked after the death of the maker solely on the ground of mental incapacity. To overcome such a prima-facie case the evidence should be clear and unquestionable. This state has been reasonably free from disgraceful

scrambles over the property of dead men who passed as men of business character and capacity in the community while they lived, and it is the duty of the courts to see that no encouragement is given to any but really well-founded contests.

The general rule as to testamentary capacity is that the testator must have a fair appreciation of the nature of the act, of what property he has, and of what he wishes to do with it. Substantially the same standard applies to the present case of a gift during life of a not clearly undue portion of his estate to his wife. As evidence of such capacity, it is settled that opinions of witnesses who knew him are admissible, but only opinions founded on facts which must first be given to the jury that they may determine the weight to be given to the opinions founded on them. They must, therefore, be facts that afford a fair foundation for an opinion on the particular point in dispute. The rule is expressed with the clearness and force that always characterized our late Brother CLARK, in First N. Bank v. Wirebach, 106 Pa. 37 : " One not having the pretensions of an expert cannot be permitted to give an opinion as to another's soundness or unsoundness, until he has first testified to facts within his own knowledge tending to show that mental condition. The particular facts stated by each of these several witnesses must be taken alone as the basis of the proposed opinion of that witness : thus considered, they are found to be in themselves inconclusive in their nature, of such neutral character as in some instances, at least, to be consistent either with soundness or unsoundness of mind. Such facts could not reasonably be assumed as the basis of an opinion as to either."

Tested by this standard, the facts related by Logan and Alston were not sufficient to justify the reception of their opinions. The burden of their testimony was as to change of physical appearance, which was not surprising, as one of them had known Elcessor forty years, and the other, eighteen. Neither had had any business transactions with him for years; and, though Logan testifies to conversations about making money, and about dealing in pork and grain and oil, and to visits to bucket shops, yet he never saw Elcessor buy or sell on such occasions. That a man such as Elcessor was shown to be, of good natural mind but entirely illiterate, " carrying his business in his head," as one witness said, because unable to read and write, and shut

Statement of Facts.

out thereby from mental occupation through those channels, should, when disabled for his trade by a physical breakdown at a rather early age, occupy his mind with visions of speculative fortune and hang around the edges of the dangerous maelstrom, but with no evidence that he ever ventured in, was certainly no fair indication that he did not know what property he had, and what he wished to do with it. Such testimony was, at the most, of that neutral character consistent with soundness as well as unsoundness of mind, which, as said in First N. Bank v. Wirebach, supra, " could not reasonably be assumed as the basis of an opinion." The fourth and fifth assignments of error must therefore be sustained.

　　　　　　Judgment reversed, and venire de novo awarded.