Hagopian, Appellant, *v.* Eskandarian.

402

Argued May 7, 1959.   Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and McBRIDE, JJ.

reargument refused September 9, 1959.

*William R. Cooper,* with him *William F. Heefner,* for appellant.

*Donald B. Smith,* for appellees.

OPINION BY MR. JUSTICE BOK, July 2, 1959:

This is plaintiff's appeal from a decree that his complaint in equity be dismissed.

The following events form the skeleton of the case:

February 27, 1930, property in Telford, Bucks County, was purchased, in half interests, from Charles C. Goessler and title was taken in the names of Khatoun Z. Eskandarian, wife of Mihran, and Louis Der Hagopian, brother of plaintiff, as straws for plaintiff and the Eskandarians;

April 1, 1930, an option lease was executed by the title holders of the property to plaintiff, giving him the right to buy the Eskandarian interest for $750 within ten years;

July 13, 1935, plaintiff signed an agreement to sell his half interest to the Eskandarians, retaining part of the back property;

September 3, 1935, after bargaining, plaintiff signed another agreement, in place of that of July 13, with, among other things, a 20-year lease under which he could move his bungalow on to part of the land;

November 14, 1935, plaintiff, who was under disability from the First World War, was committed to Allentown State Hospital and later transferred to the Veterans' Administration Hospital at Coatesville, whence he was discharged on November 3, 1936;

November 19, 1935, deeds from Louis and Rose to a straw and by the straw to the Eskandarians having been signed, settlement was held on the September 3rd agreement, and a lease was signed for fifteen years as favorable to plaintiff as the 20-year lease and in place of it;

September 15, 1936, plaintiff was adjudged a weak-minded person by order of the court below and John N. Ouzounian, Esquire, his counsel, was appointed guardian of his estate;

July 17, 1953, the guardian was discharged and plaintiff declared competent;

May 28, 1954, this action was begun, the prayer being for the setting aside of the deeds disposing of plaintiff's half interest, ordering a reconveyance, and directing an accounting of the rents and profits for nineteen years.

Louis Der Hagopian and Rose, his wife, are technical defendants and no relief against them is asked. Louis held title for plaintiff and disposed of it as he directed. The Eskandarians are the real defendants.

There are two questions: whether plaintiff was mentally incompetent on July 13 and September 3, 1935, and whether there is valid after-discovered evidence.

The chancellor made basic findings that plaintiff was competent, and we see no reason to disturb them.

Mental competence to do business is presumed and the burden lies on him who denies it: *Lasky v. Paprocki*, 363 Pa. 50, 68 A. 2d 593 (1949). The evidence to show incompetence must be "clear and unquestion-

able", *Elcessor v. Elcessor,* 146 Pa. 359, 23 A. 230 (1892); "positive", *Patterson v. Snider,* 305 Pa. 272, 157 A. 612 (1931); "strong, clear, and compelling", *Masciantonio Will,* 392 Pa. 362, 141 A. 2d 362 (1958).

Contracts made with the incompetent before his adjudication as weak-minded are voidable and can be avoided only on proper showing that he was in fact incompetent at the time: *Feely Estate,* 173 Pa. Superior Ct. 441, 98 A. 2d 738 (1953). After the adjudication, transactions with him are presumably invalid: *Pennsylvania Co. v. Philadelphia Co.,* 372 Pa. 259, 93 A. 2d 687 (1953). Even a lunatic may be liable if a transaction is for his benefit and there is no evidence of overreaching: *Wirebach v. First National Bank,* 97 Pa. 543, 39 Am. R. 821 (1881); *First National Bank v. Fidelity Co.,* 251 Pa. 529, 97 A. 75 (1916); *Pfeil's Estate,* 287 Pa. 21, 134 A. 385 (1926); *Rubins v. Hamnett,* 294 Pa. 295, 144 A. 72 (1928).

Further, we can take judicial notice of the fact that not all forms of mental illness hit one like a bolt of lightning, but are often a matter of growth and clouding over: see *King v. Humphreys,* 138 Pa. 310, 22 A. 19 (1890). Expert testimony is needed when transactions fall within the penumbra between competence and incompetence, when the light of reason may come and go unbidden. Dr. Kressley, one of the commission that found plaintiff weak-minded, testified but was not asked about the nature of plaintiff's illness or about lucid intervals.

There is no doubt, after reading this long record, that plaintiff was difficult, increasingly so as the time of his commitment approached. It is the conventional picture of a family, somewhat volatile themselves, doing their best with an intractable member. The chancellor has expressly found that plaintiff was competent on the date of the two agreements.

Plaintiff contends that the Medical Records of the Veterans' Administration should have been admitted under the Business Records as Evidence Act of May 4, 1939, P. L. 42; 28 P.S. §91b, and the Federal Official Records Act of May 24, 1951, P. L. 393; 28 P.S. §121. These records show the following entries:

"6/4/35-6/21/35. Veterans Administration Facility, Washington, D. C.

FINAL DIAGNOSIS. 1. Dementia praecox, mixed type with strong paranoid trend (not competent). Treated, unchanged. . . .

"7/19/35. Rating sheet. Investigation report and report of diagnostic center dated 6/13/35 have been noted. In compliance with instructions of Board of Veterans' Appeals no rating action is being taken. Case should be returned to Board of Appeals for final action.

"10/9/35. Rating sheet. . . .

"Dementia praecox mixed type with strong paranoid trend . . . Competent under R & P 6735 pending follow-up by investigator. . . .

11/12/35-12/4/35. Allentown State Hospital, Allentown, Pa.

DIAGNOSIS. Dementia praecox, mixed type.

"12/4/35-3/9/36. VA Hospital, Coatesville, Pa.

FINAL DIAGNOSIS. 1. Dementia praecox, paranoid type. Treated, improved. . . .

"9/9/46-9/30/46. VA Hospital, Coatesville, Pa.

DIAGNOSIS. Dementia praecox, paranoid type, untreated, unchanged . . ."

These records were properly excluded: *Paxos v. Jarka Corp.*, 314 Pa. 148, 171 A. 468 (1934); *Haas v. Kasnot*, 371 Pa. 580, 92 A. 2d 171 (1952); *Graves v. Graves*, 184 Pa. Superior Ct. 265, 132 A. 2d 699 (1957). In *Graves*, citing *Paxos*, the Superior Court said: "The hospital records should not have been admitted into

evidence. The Supreme Court of Pennsylvania pointed out the limits on the admission of such records, as an exception to the hearsay rule, and indicated the probative elements that must be present as follows: (1) They must be made contemporaneously with the acts to which they relate; (2) they must have been made ante litem motam; (3) they must have been made by a person having knowledge of the facts set forth."

There is no evidence whatever to qualify the records under either Act. Mr. Karet, a lawyer, produced them, and when asked whether he was their custodian he said: "For the purpose of producing them in court in response to a subpoena I am." He added that the record bears "the signatures of the physicians who presumably dictated [them] and approved the report", and that he had no knowledge of the doctors or of their qualifications. Thus there is no assurance from the naked paper that the entries were made on the date they bear, or that they were made by the signatories, or that the signatories were doctors. "Evidence", as used in the Acts, means competent legal evidence to the extent indicated.

Even if these records had been admitted, they would not cover the critical dates of July 13 and September 3, 1935. On their face they do not show a static mental condition between June and November, and there is no evidence that the named disease is unrelieved by lucid intervals. Rather to the contrary is paragraph 11 of the complaint, which avers that plaintiff visited his guardian "during a lucid interval." This was established by the evidence as being in 1938, but it is indication from the plaintiff himself that lucid intervals were possible and did occur in his disease. The Chancellor found that during the time in question plaintiff's malady was intermittent and spasmodic. He also found that plaintiff had not been overreached. On the con-

trary, he showed what the Scotch call "the sign of the thread", an instinct to bargain, when he drove up the price for his interest from $1000 to $1600. He gave ample evidence that he understood his affairs and knew what he was about. He may have acted strangely during this period, but since nearly everyone is a little strange, this is not the criterion or there would be no business done.

The Eskandarians met their part of the bargain in paying off the mortgage and footing the carrying charges, and they have tendered him a deed for the back land provided for in the agreement. He got from the deal he made $600 in cash, a $1000 mortgage that was paid off, a lease allowing him to live on the land at a dollar a year for fifteen years, with the right thereafter to a deed to the back land and also the right to move his bungalow on to it.

Plaintiff says he now wants $18,000 for the half interest he sold in 1935, but it is significant that his guardian, a reputable former member of the Philadelphia bar, never moved to take up the option of 1930 or to set aside the conveyance, although plaintiff often asked him to do so. Meanwhile the Eskandarians have developed the property and made a substantial investment in it. Plaintiff is still living in the bungalow which he has occupied on the property since his discharge from the Veterans' Hospital in 1936.

We agree that plaintiff has not carried his burden of proof, and that there are no equities in his favor.

As for the after-discovered evidence, seven instances are listed. None of them meets the rule set forth in *Felo v. Kroger G. & B. Co.*, 347 Pa. 142, 31 A. 2d 552 (1943), and *Helmig v. Rockwell Mfg. Co.*, 389 Pa. 21, 131 A. 2d 622 (1957), that after-discovered evidence, to justify a new trial, must have been discovered after the trial, be such that it could not have been obtained at

the trial by reasonable diligence, must not be cumulative or merely impeach credibility, and must be such as would likely compel a different result.

The only item of the seven that bears mention is that Dr. Barship, one of the Veterans' Administration doctors who examined plaintiff in 1935, has been discovered living in Florida, the others being unknown or dead. There is no affidavit or statement saying what Dr. Barship would testify to: we know only that he is willing to come and give evidence. Nor is it at all clear that even if he did testify that plaintiff was as mad as a March hare on the crucial dates it would have altered the chancellor's result: the weight of the evidence remains heavily in favor of his findings.

The decree is affirmed, costs to be paid one-half by the plaintiff and one-half by the appellees.