## Stebbins et al. v. The New York State Natural Gas Corporation

*George Linton*, for plaintiffs.

*Crichton, Owlett, Cox & Wilcox* and *G. Kirby Herrington*, for defendant.

ROSENFIELD, P. J. (42nd judicial district, specially presiding), October 9, 1951.—Plaintiff George A. Stebbins, by Joseph B. Stebbins, his next friend, and Joseph B. Stebbins, Milford H. Stebbins, Arnold J. Stebbins, and Erma Kilbourne, children of George A. Stebbins, and grantees in a deed from him and Theodore K. Karhan and Olga Kyofski, brought this bill in equity against defendant asking that two modification agreements entered into (1) between George A. Stebbins and defendant, and (2) between George A. Stebbins and Theodore K. Karhan and Olga Kyofski, be canceled and set aside, and that defendant be restrained and enjoined from entering upon the

premises described in those modification agreements, and from preparing the premises for the storage of gas, and for such other relief as may be necessary and proper. Plaintiff's claim that the father was mentally incapable of entering into a modification agreement on June 10, 1949, that this agreement should be canceled as to Mr. Karhan and Mrs. Kyofski because they entered into the cancellation agreement only because Stebbins had done so, and the four Stebbins children claim that the modification agreement is invalid as to them because their father, George A. Stebbins, made a deed conveying the property to them antedating the modification agreement, though this deed was not recorded until after the modification agreement had been recorded. Plaintiff Olga Kyofski contended that the modification agreement was invalid as to her because her husband had not joined therein.

Defendant filed an answer thereto denying that George A. Stebbins was incapable of signing the contract on June 10, 1949, denying that any fraudulent representations were made to Stebbins, admitting that Joseph Kyofski, husband of the plaintiff, Olga, had not signed the modification agreement, denying that defendant had any notice of any deed from George A. Stebbins to his children until after it had contracted and placed on record the modification agreement, and averring that the modification agreement was legal as to Olga Kyofski, it being their contention that this agreement is a mere lease for the storage of gas in the place from which gas had previously been taken by defendant under lease from plaintiff.

### Findings of Fact

1. All plaintiffs are adult citizens of the State of Pennsylvania.

2. Defendant is a New York State corporation authorized to transact business in Pennsylvania, with its principal office in Pittsburgh.

3. Under date of April 11, 1935, plaintiff George A. Stebbins entered into an agreement with defendant's predecessor in title in which he leased to the latter for the purpose of drilling for and producing oil and gas a certain tract of land in Clymer Township, Tioga County, Pa., by lease recorded April 15, 1935, in Tioga County recorder's office in Deed Book 203 at page 325.

4. Under date of April 25, 1935, Albert Karhan entered into a similar agreement with the lessee, defendant's predecessor in title, under which they leased another tract of land in the same township for the same purposes by lease recorded in Deed Book 203 at page 362.

5. On September 28, 1935, the lessors mentioned in paragraphs 3 and 4 entered into what is known as a pooling agreement with lessee's immediate successor in title. This was recorded in Deed Book 207 at page 125. The purpose of the agreement was to avoid the draining of each lot by a well on the other, and to provide a just distribution of the proceeds of a paying well on either lot. The validity of this instrument and those mentioned in the proceding two paragraphs is not attacked by the bill in equity.

6. Present defendant is the successor of the lessee under the pooling agreement in lieu of the Potter Development Company.

7. Present defendant is successor to the lessee in the original lease agreements mentioned in findings 3 and 4.

8. On March 20, 1937, George A. Stebbins, "in consideration of $1.00 & natural love & affection" conveyed to Joseph B. Stebbins .86 of an acre of land which was part of the land that was under the original gas and oil lease entered into by George A. Stebbins. This deed was acknowledged November 22, 1938, and recorded March 11, 1947, in Tioga County Deed Book 245 at page 95.

9. No notice of the existence of this deed was given to defendant, or its predecessors, and no notice of the recording thereof was given to them, and they had no notice thereof at the time when the modification agreement of June 10, 1949, was entered into between Stebbins and them, and this despite the fact that the lease contained the following provisions: "Lessees shall not be bound by any change in ownership of said land or the assignment of royalties thereon until furnished with original instrument of conveyance or assignment."

10. On November 3, 1938, George A. Stebbins executed a deed in favor of his four children, Joseph B. Stebbins, Milford H., and Arnold J. Stebbins, and Erma Kilbourne, plaintiffs herein, purporting to convey land covered by oil and gas lease mentioned in the third finding of fact. This deed was acknowledged on November 3, 1938, and recorded March 14, 1950, in Tioga County Deed Book 255 at page 198.

11. Until approximately the date of the recording of the deed, and until long after the recording of the modification agreements, the deed remained in the possession and the control of the grantor in a drawer of a bureau of his private room.

12. While this deed was in his possession and control, George A. Stebbins stated that he had "fixed everything so his children would get his property without any trouble", and said, "I have the deed right here". At the same time he contended that "he still owned the land in his own name".

13. Up to the date of the modification agreements, George A. Stebbins continued to receive for his own benefit and use the income due the lessor under the oil and gas leases from the predecessor in title of defendant.

14. Since the date of the modification agreements defendant has, at the proper times, tendered payment of all rentals due under the gas and oil leases.

15. None of these payments or tenders were ever challenged and are not now challenged by plaintiffs on the ground that they should have been made to anyone other than to George A. Stebbins; and his children desired them to be so made, and never, even at the trial, asserted title thereto in themselves.

16. At least two of the family witnesses certified the right of their father to receive these payments by endorsing under his endorsement checks issued to him for rentals and payments due.

17. The only testimony in the case on the part of plaintiffs to the effect that the deed from George A. Stebbins to his children was delivered prior to the modification agreements is that of Joseph B. Stebbins, one of the parties plaintiff, and the leader in the attempt of plaintiffs to have the modification agreements declared void as to his father. He also testified that other members of the family knew of the delivery.

18. The deed of George A. Stebbins to his children was not delivered until about the date of recording, March 1950.

19. There is no evidence that the originals of the deeds of George A. Stebbins to his four children, and of George A. Stebbins to Joseph B. Stebbins were ever exhibited to defendant or its predecessor in title, as provided by the original oil and gas leases.

20. After the death of Cora Karhan, lessor in lease set forth in the fourth finding of fact above, Albert Karhan, her husband, conveyed the property described in the pooling agreement to his son, Theodore Karhan, and daughter, Olga Kyofski.

21. After the gas in the field around Sabinsville had been exhausted, the lessee sought to use this field for the storage of gas brought in from Texas and West Virginia. To accomplish this it sought modification of the leases to authorize it to use the space from which

gas had been exhausted for the storage of gas so brought in from other fields.

22. For the purpose of procuring such a modification agreement, Justus H. Haun, an employe of defendant, who had been in this business in this vicinity for 14 or 15 years, called at the home of George A. Stebbins in the latter part of May 1949.

23. Haun was admitted to the home of Stebbins by Mrs. Clark Roberts, who closed the door.

24. Haun explained to Stebbins the purpose of his visit and answered questions propounded by Stebbins.

25. At Stebbins' request, Haun left the proposed modification agreement with Stebbins.

26. At that time the modification agreement contained no obliterations or deletions.

27. Haun returned to the home of Stebbins on June 10, 1949, and found Stebbins in his room but not in bed.

28. Haun and Stebbins discussed the agreement left with Stebbins by Haun in May, and Stebbins insisted on certain changes favorable to him: (a) Instead of one payment of $100 as liquidating damages, Stebbins insisted upon $300 per year, that is, $75 per year for his share in the pooling agreement, the same sum he had previously been receiving; (b) he insisted that the clause providing that the lessee no longer be required to furnish free gas as provided in the original agreements, be deleted and that free gas be furnished as heretofore.

29. After the alterations had been made, Stebbins signed the modification agreement, dating it June 10, 1949, and it was acknowledged the same day and recorded December 12, 1949.

30. Only Haun, who witnessed and notarized the modification agreement, and Stebbins were present.

31. The contract negotiated by Stebbins was more advantageous to him than other similar contracts then

being negotiated were to the owners of their respective properties.

32. On July 8, 1949, Haun obtained the signatures of Theodore Karhan and Olga Kyofski to the modification of the pooling agreement. Theodore and Olga signed the same, relying on the fact that George A. Stebbins had signed it previously.

33. The modification agreement referred to in our finding 30 was not signed by Joseph Kyofski, husband of Olga, who was then alive and not divorced from Olga.

34. Neither Joseph B. Stebbins, Milford H. Stebbins, Arnold J. Stebbins, nor Erma Kilbourne, grantees in the deed from Joseph A. Stebbins, ever signed any modification agreement or ratification or confirmation of that signed by George A Stebbins.

35. On June 10, 1949, Justus H. Haun delivered to George A. Stebbins, a check on defendant company for $300, which was actually in payment for one year in advance for the modification agreement.

36. The receipt signed by George A. Stebbins for the same check specifically states that the $300 payment was "Gas well rental in full, from June 15, 1949 to June 15, 1950, account lease 50488", this receipt making no mention of any modification.

37. On June 10, 1949, defendant paid George A. Stebbins $2 in the form of a check, taking from George A. Stebbins a receipt, the consideration of $2 being "For consideration account modification of leases 50487 and 50488 (storage)."

38. The number of the original lease signed by George A. Stebbins in 1935 is 7487.

39. There is no affirmative evidence that Joseph B. Stebbins knew of the proposed modification agreement until he went to Wellsboro early in March 1950, saw the modification agreement on record, and had the deed from George A. Stebbins to the four children recorded.

40. Defendant did not attempt to deceive or overreach George A. Stebbins.

41. On February 13, 1946, George A. Stebbins suffered a cerebral hemorrhage rendering him unconscious for 13 or 14 hours and causing a paralysis of the right side of the face and left arm and leg.

42. This hemorrhage, according to his doctor, "was not very severe".

43. The day after the stroke Dr. Williams saw Stebbins "he still showed some paralysis of the right side of the face and of the left arm and left leg. He gradually was regaining use of the leg and arm". He fully recovered from the paralysis in two weeks, according to his physician.

44. There are today no residual signs of cerebral hemorrhage, that is, no speech difficulties, no paralysis of the face or the extremities.

45. Prior to the stroke, George A. Stebbins had suffered from high blood pressure and arteriosclerosis, and is still suffering therefrom.

46. On June 10, 1949, the date of the modification agreement, George A. Stebbins was 86 years of age.

47. After the stroke at times he would have spells, sometimes lasting 24 hours, sometimes less, and sometimes a week or 10 days, during which he would be irrational and belligerent, and would talk of those who were deceased.

48. His physician states that "he was not as mentally alert in 1951 as in 1946".

49. George A. Stebbins was mentally capable of transacting business in May 1949 when Haun called upon him, and on June 10, 1949, when he executed the modification agreement.

50. George A. Stebbins has never been declared mentally incompetent.

51. No fraud or misrepresentations was perpetrated upon Stebbins.

52. We make note of the stipulation filed in this case, lest it be overlooked, showing that certain endorsements of George A. Stebbins, Iola Stebbins, and Milford H. Stebbins do not appear on defendant's exhibits 2, 3, and 5 as photostated, the photostat not picking up the penciled endorsements.

## Discussion

This case is controlled largely by the determination of what was the mental condition of George A. Stebbins on June 10, 1949, when he signed the modification agreement.

A grantor in a deed may avoid his conveyance by proof that he was non compos mentis *at the time of its execution:* Crawford v. Scovell, 94 Pa. 48, 51 (1880). Mental capacity to transact business is presumed, and the burden of establishing its nonexistence is on those who deny it: Lasky v. Paprocki, 363 Pa. 51; Teats v. Anderson et ux., 358 Pa. 523. The Supreme Court said, in Patterson v. Snider et ux., 305 Pa. 272, 276:

"The burden of proving Holliday's contractual incapacity was upon the plaintiff. In Hamilton et al. v. Fay, 283 Pa. 175, 178, this court said: 'Sanity and mental capacity are presumed and the burden is on him who alleges the contrary. "Testamentary capacity is the normal condition of one of full age, and the affirmative is with him who undertakes to call it in question, and this affirmative he must establish, not in a doubtful, but in a positive manner (although not necessarily by positive evidence)": Grubbs v. McDonald, 91 Pa. 236; Palmer's Est., 219 Pa. 303, 310.' In Elcessor et al. v. Elcessor, 146 Pa. 359, this court held that evidence to prove mental incapacity must be *'clear and unquestionable.'* "

Plaintiffs have not met the burden imposed upon them. This man was 86 years of age at the time of the transaction, but old age per se does not raise a presumption of mental incapacity: American Histori-

cal Society, Inc., v. Farr, 318 Pa. 107 (1935). There is nothing to indicate that plaintiff was prevailed upon by fraud or undue influence to sign the instrument, nor is there anything to indicate that he was unable to comprehend the nature of the transaction on the day in question. On the contrary, the testimony and the instrument itself lead to the unavoidable conclusion that, after considering the proposed instrument from the time when it was left with him in the latter part of May 1949 to June 10th plaintiff was sufficiently astute and firm to force changes in the instrument and to drive a bargain highly favorable to himself. Haun made two trips to see Stebbins, was admitted by persons at the home to the room of Stebbins and the door was closed by the person who admitted him. No effort was made to exclude Haun from the room of Stebbins, and the evidence discloses no effort made by the family to ascertain the purpose of the visit from Haun until March 1950. We are convinced that the family knew all about the purposes of these visits and knew that George A. Stebbins had signed the instrument. Why should Haun make two trips so close together merely to pay rent under the old contract, as the family suggests they thought he did, if Stebbins did not know what he was doing? Haun could easily have obtained the signature on the first trip if Stebbins were incompetent.

Plaintiff was suffering from hardening of the arteries and high blood pressure, and did have a stroke or cerebral hemorrhage on February 13, 1946. We cannot conceive that this was too serious, for his own doctor testified that Stebbins recovered from the paralysis in "I think about two weeks—it wasn't very severe—severe enough to knock him out". A member of the family testified that he was not paralyzed in any of his motions for over a day or two, "And it gradually worked out in maybe a week". His physician,

Dr. Williams, testified that plaintiff was able to write his name and that he did recognize his signature; "It all depends on what day you showed it to him". The doctor was asked concerning the condition of George A. Stebbins on June 6, 1949, when he saw Stebbins, "Was he rational? Not that day, he wasn't, or the sixteenth either". By implication, the doctor states that the man was rational on some days, even in his opinion, for he did not say that plaintiff never was rational. Further, he said: "He is not as mentally alert in 1951 as he was in 1946." The two physicians, one a specialist in mental diseases, testified that Dr. Williams had said in substance that Stebbins is a pretty keen old man at times, and "except when he had these spells". On this subject, Dr. Williams was somewhat evasive. He said:

"Q. You remember telling Dr. White that day that Mr. Stebbins was a pretty smart old man, except when he had these spells?

"A. I remember telling Dr. White that Mr. Stebbins was a very bright old man, and it was too bad he was in the shape he is in today.

"Q. Then you didn't say he was a pretty bright old man, except when he had these spells?

"A. I did not."

Dr. Williams admitted that on the day when defendant's two physicians examined him he was oriented that day, "seemed to know it was the fifth of July". This was in reply to the question, "What would you say his condition was?" Certainly this answer did not state that he was incapable of comprehending the nature of a business transaction on that date. Dr. Williams did say that after February 13, 1946, plaintiff was not mentally competent to do business, but did not say that George A. Stebbins was unable to comprehend the nature of a transaction or that he had

no periods when he was able to comprehend the nature of such a transaction. Dr. Brickhouse, a psychologist, employed by defendant, said that on the date when Dr. White, Dr. Williams, and he examined George A. Stebbins, "He was mentally competent", though, of course, he said that he had arteriosclerosis and high blood pressure. The doctor impressed us as being fair. He would not venture an opinion as to the man's condition on the date of the instrument in question, stating that would depend on the extent of the hemorrhage, what centers were involved, and what mental symptoms were manifested at the time.

No disinterested witness appeared to support plaintiffs' contention. Theodore Karhan and Mrs. Kyofski, who teach in various colleges, and who are the nephew and niece of George A. Stebbins were not asked a single question about his competency. They testified to his competency when they averred in this bill in equity, paragraph 18, "That they signed the same on the strength of the signature of George A. Stebbins which was fraudulently obtained . . .". There is no evidence that this instrument was fraudulently obtained. These relatives must have thought him competent mentally for they relied upon him, and we have the right to conclude that they, as relatives, would have been aware of his incapacity, if any existed.

He endorsed checks and members of the family endorsed the checks after him.

His son, Joseph B., testified that after the father had been in a coma 13 or 14 hours, "He gradually came to a little bit and began to *talk sense*".

His daughter-in-law was asked whether his condition is about the same now as on February 13, 1946. Her two answers were very unsatisfactory to us. They are:

"Q. You say your father-in-law's mental condition is about the same now as it has been since February 13, 1946?

"A. It isn't any better."

"Q. If anything, it is worse, is that what you mean?

"A. If anything isn't better, it is naturally growing worse."

Most significant is the result obtained by Stebbins. Of all lessors in this field, Stebbins wrangled the best deal out of the company. The modification agreement left by Haun on the first trip was altered to make the storage rental equal to the same price received by the lessors when defendant was taking gas from the ground. More than that, he compelled Haun to insert in the modification agreement a provision that the lessors should have the same rights to free gas which they had under the original lease. The results obtained by George A. Stebbins manifest very considerable business acumen and determination.

There never was any adjudication of George A. Stebbins' mental incapacity.

### Lease Without Joinder

Olga K. Kyofsky contends that the modification of the lease is invalid as to her because her husband did not sign the instrument.

The modification agreement recites: "Whereas the parties hereto desire to amend said lease to permit the underground storage of gas. . . . In other words, the purpose of the change was to enable defendant to use space made vacant by the exhausting of the gas for the storage of gas pumped back into the same. For that purpose, the instrument is a lease and, hence, it is valid without the joinder of the husband: Ewing v. Cottman, 9 Pa. Superior Ct. 444; McCafferty v. Davis, 74 Pa. Superior Ct. 172.

Whether or not the modification agreement attempted to convey an interest in land so far as the production of gas and oil thereof is concerned, it also created a leasehold estate so far as the storage of gas

is concerned. As defendant stated in its brief, "The contract is clearly severable as to these provisions, and the leasehold will stand without the husband's signature even though the conveyance fall because of its absence. . . . A contract may be severable as to its object, part being illegal and part legal": Smith's Appeal, 113 Pa. 579; Monongahela River Consolidated Coal & Coke Company v. Jutte, 210 Pa. 288.

### Delivery of Deed

Plaintiff contends that George A. Stebbins had no right to sign the modification for: (1) He had conveyed to his son, Joseph, .86 of an acre by deed dated March 20, 1937, acknowledged November 22, 1938, recorded March 11, 1947, that is, before the date of the modification agreements, and (2) he had conveyed to his four children the remaining property in question by deed bearing date, November 3, 1938, acknowledged the same day, and recorded March 14, 1950, that is, after the date of the modification agreement.

Plaintiff claims that the latter deed had been delivered before the date of the modification agreement, June 10, 1949. The only evidence on this subject supporting this contention is the testimony of the son, Joseph, grantee, who was very indefinite about the date of delivery, but fixed it at a couple months after its date. Why should it have been delivered a couple months after this date, and if so, why was it not put on record at once? When asked what he did with the deed after its delivery to him, Joseph said:

"Q. After this deed was delivered to you what did you do with it?

"A. Kept it in the safe.

"Q. In your own home?

"A. Yes.

"Q. Where was that safe?

"A. Not a safe—a bureau drawer.

"Q. Where was that bureau drawer?

"A. In my father's room.

"Q. This room of your father's was the room he stayed in and lived most of the time?

"A. That is right.

"Q. This room wasn't used by anyone other than your father—he was the only person there?

"A. I kept all my papers in his room on account of the children. They didn't go in his room.

"Q. He the only person that slept in that room?

"A. Yes.

"Q. As a matter of fact he spent most of his time in that room in later years before he left your home, didn't he?

"A. A good share of it.

"Q. That also where this other deed, Exhibit J, was kept by you?

"A. That is right.

"Q. And these deeds were kept by you together, were they?

"A. That is right.

"Q. They were kept in this bureau drawer until they were put on record?

"A. That is right."

Such testimony does not justify us in crediting his statement that the deed was delivered to him.

"The presumption, in the absence of proof to the contrary, is that a deed is executed and delivered on the day it is acknowledged": Wolford v. Rimbey, 318 Pa. 353, 355 (1935); also, Herr et al. v. Bard et al., 355 Pa. 578 (1947), wherein the court held that the evidence supported the finding that an acknowledged deed had not been delivered. In the instant case the presumption does not apply because there is such proof to the contrary, namely, the testimony of Joseph B. Stebbins, plaintiff and grantee, to the effect that it was

not delivered on that day but was delivered a couple months later. Delivery is a manner of intention to pass title and may be accomplished by words alone, acts alone, or by both. But there must be enough to show an intention to pass title: Dayton v. Newman, 19 Pa. 199. When Haun called the second time, he was told by George A. Stebbins, in substance, that the deed had not been delivered. Admittedly the deed was then in the dresser drawer in the room of George A. Stebbins, admittedly had not been recorded then, and as we have previously shown, these deeds were, by the admission of Joseph B. Stebbins, kept in the bureau drawer in the room of George A. Stebbins until they were recorded. The burden rests upon plaintiff to prove the delivery of an unrecorded deed in the possession of the grantor: Leahy v. Leahy, 309 Pa. 347. As of the date of the modification agreements in question we are satisfied that the deed had not been delivered. Plaintiff has not met the burden imposed upon him. Joseph simply said that the deed was delivered without reference to the time, the place, the circumstances, etc. Significantly the deed bears printed words, "Signed, sealed and delivered in the presence of .........". No persons signed in the space for witnesses to the signing, sealing and delivering. Moreover, there is no proof that the grantees ever went into possession of this property and exercised any acts of ownership. Plaintiffs admit that all the income was paid to George A. Stebbins and used for his benefit.

"Long possession by the grantor, and acts evidencing ownership meanwhile, without recognition of another's rights or of a claim of ownership by a grantee, are sufficient to repel the presumption of delivery arising from a deed alone: Knolls v. Barnhart, 71 N. Y. 474, 478", cited in Leiser et al., etc., v. Hartel, 315 Pa. 537, 540 (1934).

Whether grantor or grantee collected the income is a "factor to be taken into consideration": Herr et al. v. Bard et al., 355 Pa. 578, 583.

### As to .86 of an Acre

The original lease between plaintiff George A. Stebbins and the predecessors of defendant lessee which was entered into under date of April 11, 1935, and recorded April 15, 1935, in Tioga County contained the following clause:

"Lessee shall not be bound by any change in ownership of said land or the assignment of royalties thereon until furnished with the original instrument of conveyance or assignment."

George A. Stebbins gave to Joseph B. Stebbins a deed for .86 of an acre of this land bearing date, March 20, 1937, acknowledged November 22, 1938, and recorded March 11, 1947. Of course, this was recorded before the instrument in question was executed and delivered, June 10, 1949. Defendant contends that defendant was not affected by the deed from Stebbins to his son even though it was recorded before the date of the instrument in question, because of the above-quoted provision of the original lease.

We have asked for a supplemental brief from both parties and received one only from defendant. Even if Joseph gave value for this property he was bound by the lease given by his father and recorded previously to the date of his deed from his father and, hence, was bound to know all the contents thereof, including the provision in question: Finley v. Glenn et ux., 303 Pa. 131. Despite this provision of the original lease, Joseph did not furnish the lessees with the original instrument of conveyance to him. Our recording act, as amended, June 12, 1931, P. L. 558, sec. 1, 21 PS §351, in no way prevents one from inserting such a provision as this

in a lease or other conveyance. This act merely adjudges:

"Fraudulent and void as to any subsequent bona fide purchaser or mortgagee, etc. . . . without actual or constructive notice unless such deed . . . shall-be recorded, as aforesaid, before the recording of the deed or conveyance or the entry of the judgment under which such subsequent purchaser, mortgagee, or judgment creditor shall claim."

This act does not forbid the parties from inserting in a deed a provision such as the one inserted in this lease, which was duly recorded and of which, therefore, the grantees of George A. Stebbins were bound to take notice.

### Conclusions of Law

1. George A. Stebbins possessed the requisite mental capacity to make a contract on June 10, 1949, the date of the modification agreement.

2. The modification agreements are valid and binding upon George A. Stebbins and upon his grantees.

3. The rights of the predecessor in title of defendant herein have passed to defendant, and are superior, within their limitations, to the rights of the grantees of George A. Stebbins.

4. The modification agreements extend the original agreements and, in addition thereto, are simply leases for storing gas.

5. Mrs. Kyofski had the power to enter into such a contract without the joinder of her husband.

6. The contention that Mrs. Kyofski and Karhan signed the lease because George A. Stebbins signed it in no way affects the validity of the contract.

7. The original oil and gas lease by and between George A. Stebbins and defendant's predecessor in title is presently in full force and effect as modified.

8. A decree dismissing the bill as to all plaintiffs should be entered.

*Order*

Now, October 9, 1951, upon consideration of the foregoing case, it is ordered, adjudged, and decreed that plaintiffs' bill in equity be dismissed and that plaintiffs shall pay the costs hereof. The prothonotary is directed to enter the foregoing decree nisi and give notice to the parties or their counsel of record, and unless exceptions are filed thereto by either party within 10 days of such notice, the prothonotary is directed to enter the decree nisi as a final decree.